**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
LINA TENECORA, LENNY ROMERO,
DORA ALICIA GARCIA ASCENIO,
JOSE ANTONIO BARRIENTOS,
ESTELA FLORES, ROCIO GONZALEZ,
GLORIA LALVAY, MANUEL MOROCHO,
HERMELINDA RAMOS, and ELIAS VARELA,

                        Plaintiffs,

           -against-

BA-KAL RESTAURANT CORP., d/b/a
PRINCESS DINER and/or SOUTHAMPTON
PRINCESS DINER, and RICHARD BIVONA,

                        Defendants.
-------------------------------------------------------------X

                                  **REPORT AND**
                               **RECOMMEDATION**

                           CV 18-7311 (DRH) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.      **PRELIMINARY STATEMENT**

      Plaintiffs Lina Tenecora ("Tenecora"), Lenny Romero ("Romero"), Dora Alicia Garcia

Ascenio ("Ascenio"), Jose Antonio Barrientos ("Barrientos"), Estela Flores ("Flores"), Rocio

Gonzalez ("Gonzalez"), Gloria Lalvay ("Lalvay"), Manuel Morocho ("Morocho"), Hermelinda

Ramos ("Ramos"), and Elias Varela ("Varela") (collectively, "Plaintiffs") commenced this

action against Defendants Ba-Kal Restaurant Corp., d/b/a Princess Diner and/or Southampton

Princess Diner ("Ba-Kal Restaurant") and Richard Bivona ("Bivona") (collectively,

"Defendants") alleging:  (1) hostile work environment and disparate treatment based on race,

ethnicity, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law § 290

*et seq.* ("NYSHRL"); (2) sex-based discrimination in violation of Title VII and the NYSHRL;

and (3) discrimination based on race and ethnicity in violation of the Civil Rights Act of 1866,

42 U.S.C. § 1981 ("Section 1981").  *See generally* Complaint ("Compl.") [DE 1].  As a result of Defendants' failure to answer or otherwise respond to the Complaint, the Clerk of the Court entered a Certificate of Default against the Defendants on July 22, 2019, pursuant to Federal Rule of Civil Procedure 55(a).  *See* DE 35.

On February 14, 2020, Plaintiffs moved for entry of default judgment against the Defendants.  *See* Plaintiffs' Notice of Motion for Entry of Default Judgment ("Pls.' Not. of Mot.") [DE 47]; Plaintiffs' Memorandum in Support of their Motion for Entry of Default Judgment ("Pls.' Mem.") [DE 47-2].  Judge Hurley referred the motion to this Court for a Report and Recommendation "as to whether Plaintiff's have demonstrated that the allegations in the Complaint establish the Defendants' liability such that the motion for default judgment should be granted, and, if so, to determine the appropriate amount of damages, costs, and/or fees, if any to be awarded."  *See* Electronic Order, dated February 18, 2020.  For the reasons which follow, the Court respectfully recommends to Judge Hurley that Plaintiffs' motion be GRANTED, in part, and DENIED, in part.

## II.    BACKGROUND

### A.    Factual Background

The following facts are taken solely from the Complaint and are accepted as true for purposes of the instant motion.[1]  *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

---

[1]    The Court notes that the declarations submitted in support of the instant motion include additional factual allegations pertaining to liability.  However, "[i]n determining whether a plaintiff is entitled to default judgment, the court is 'limited to the non-conclusory, factual allegations' in the complaint."  *Antoine v. Brooklyn Maids 26, Inc.,* No. 19-CV-5676, 2020 WL 5752186, at *1 (E.D.N.Y. Sept. 26, 2020) (quoting *Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman*, 969 F. Supp. 2d 278, 287 (E.D.N.Y. 2013)); *see also Donald v. Park & Fly LLC*, No. 10-CV-0041, 2011 WL 13295391, at *4 (M.D. Fla. Feb. 7, 2011) ("Plaintiff has not cited any authority that suggests a deficient complaint can be cured by the filing of an affidavit submitted in support of a motion for default judgment, the Court will not

Plaintiffs were employed by Defendant Ba-Kal Restaurant, located in Southampton, New York, as wait staff, cooks and bussers from 1999 to 2016. Compl. ¶ 1. Sometime in August 2016, Defendant Bivona assumed ownership of Defendant Ba-Kal Restaurant. *Id*. ¶¶ 22, 46. Prior to Defendant Bivona, non-party John Kalogeras ("Kalogeras") owned Ba-Kal Restaurant. *Id*. ¶ 2. At all relevant times, Kalogeras was the Manager of Ba-Kal and the main supervisor of the Plaintiffs. *Id*. ¶¶ 4, 23. Plaintiffs claim that Kalogeras and Defendant Bivona created and perpetuated a hostile work environment for all Plaintiffs on account of their ethnicity, race and national origin and treated them disparately as compared to their white co-workers. *Id*. ¶ 3. Plaintiffs Tenecora, Romero, Flores, Lalvay, and Ramos also claim that Kalogeras and Defendant Bivona discriminated against them based on their gender. *Id*. ¶¶ 2-3. The Court now turns to the respective claims asserted by each of the individual Plaintiffs.

### 1. *Lina Tenecora*

Plaintiff Tenecora is of Ecuadorian ancestry and was employed by Defendants as a waitress from approximately March 2001 to December 2016. *Id*. ¶¶ 28, 29. At all relevant times, she was directly supervised by Kalogeras and often interacted with Defendant Bivona after he assumed ownership of Ba-Kal Restaurant. *Id*. ¶ 31. During her employment, Plaintiff Tenecora claims that she was rarely allowed to take meal breaks during her shifts which forced her to "have to stand and hide her food, gulping it down in order to not be seen." *Id*. ¶ 33. In the instances when she was able to take a meal break, Plaintiff Tenecora was provided only a few minutes to eat and was yelled at by Kalogeras to hurry up. *Id*. ¶ 33. Kalogeras frequently yelled at Plaintiff Tenecora if she was momentarily inactive, looked at her phone, or took calls during

---

consider Plaintiff's Affidavit for purposes of resolving this Motion.").

her shift.  *Id*. ¶¶ 33-35.  According to Tenecora, Kalogeras did not reprimand the white employees for engaging in the same behavior.  *Id*.  Sometime in August 2016, Plaintiff Tenecora stopped receiving wages from Defendants when Bivona assumed ownership of Ba-Kal Restaurant.  *Id*. ¶ 46.  She alleges, upon information and belief, that only the Latino/a employees' wages were withheld.[2]  *Id*.

Plaintiff Tenecora asserts that Kalogeras "often" yelled at her, *id*. ¶ 36, and called her derogatory names, such as "espicanita" (female "spic")[3] and "mojada" (wetback) on a "daily" basis.  *Id*. ¶ 37.  Whenever clients who appeared to be Latino/a entered the restaurant, Kalogeras made comments to Plaintiff Tenecora, such as "oh look, your family is here," or "more Mexicans are coming."  *Id*.  Kalogeras also scolded Tenecora and prohibited her from speaking in Spanish with her co-workers.  *Id*. ¶ 38.  Tenecora also claims that both Kalogeras and Defendant Bivona subjected her to sexual comments and harassment.  *Id*. ¶ 43.  For example, Kalogeras "regularly" told Plaintiff Tenecora that he liked the way her uniform fit her body or made comments to her, such as "tienes un nice culo" (you have a nice ass) or "quisiera tener una Ecuatoriana como tu" (I would like to have an Ecuadorian woman like you).  *Id*. ¶ 40.  According to Tenecora, Kalogeras "ceaselessly" stared at her body, causing her extreme discomfort and embarrassment.  *Id*. ¶ 40.

---

[2]    "A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory."  *Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).  A plaintiff may plead facts "upon information and belief" when "the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."  *See id.* (quotations and citation omitted).  Each of the allegations in the Complaint regarding the payment of wages to non-Latino/a employees are pleaded "upon information and belief."  Compl. ¶¶ 17, 46, 152, 176.  The Court also points out that the Complaint references Latino and Latina employees as "Latino/a" which the Court adopts here for ease of reference.

[3]    The Court notes that the English translations provided in parenthesis are provided directly by Plaintiffs in the Complaint.

In November 2016, Defendant Bivona sent Plaintiff Tenecora a number of text messages requesting to see her and inviting her to his home on the days she was off from work. *Id*. ¶ 43. He also sent Tenecora a text message saying, "Lina, I am still hungry," which she interpreted as a sexual insinuation. *Id*. ¶ 44. Tenecora claims that these text messages made her extremely uncomfortable. *Id*. ¶ 43. Kalogeras "frequently" made sexual comments in front of Plaintiff Tenecora and other female wait staff about each other and the female patrons who visited the restaurant. *Id*. ¶ 41. In November 2016, Plaintiff Tenecora heard Kalogeras make comments about Plaintiff Romero's body and ask Plaintiff Romero several times why she would not sleep with Defendant Bivona so that he would pay the workers withheld wages. *Id*. ¶ 42.

According to Plaintiff Tenecora, Kalogeras and Defendant Bivona's sexual comments and harassment made her feel humiliated and degraded. *Id*. ¶ 47. Based on their behavior, Tenecora did not want to be left alone with them. *Id*. ¶ 45. She claims that the mistreatment and harassment she received and witnessed of other fellow Latino/a employees harmed her and reduced her quality of work and life. *Id*. ¶ 48.

### 2.    Lenny Romero

Plaintiff Romero is of Ecuadorian ancestry and was employed by Defendants as a busser from approximately May 2014 to December 2016. *Id*. ¶¶ 49, 50. At all relevant times, she was directly supervised by Kalogeras and frequently interacted with Defendant Bivona after he became the owner of Ba-Kal Restaurant. *Id*. ¶ 51. Plaintiff Romero claims that both Kalogeras and Defendant Bivona subjected her to sexual comments and harassment. *Id*. ¶ 53. For example, sometime in November 2016, after Defendant Bivona began withholding Plaintiffs' wages, Kalogeras said to Plaintiff Romero, in front of Plaintiff Tenecora, "Lenny, why don't you give Richard (Bivona) some ass so that he will pay all of us." *Id*. ¶ 54. Plaintiff Romero responded to

Kalogeras, "why don't you give him yours?" to which Kalogeras answered, "because he does not like mine; he likes yours." *Id*. Plaintiff Romero claims she was humiliated by Kalogeras' comment. *Id*. She alleges that Kalogeras and Defendant Bivona "repeatedly" told her that Bivona wanted to engage in "sexual intercourse" with her by asking her if she wanted to go on a date with him. *Id*. ¶ 55. Kalogeras asked Plaintiff Romero on dates on behalf of Defendant Bivona -- in front of Romero's co-workers -- telling her that Bivona liked her and wanted to spend the day with her. *Id*. Kalogeras also told Plaintiff Romero that she was "dumb for not sleeping with [Bivona] because [she] could get a lot of money from him." *Id*. ¶ 56. Romero responded that she was not interested. *Id*.

Plaintiff Romero also claims that Kalogeras made demeaning comments to her, such as calling her as "stupid" and an "ass," and telling her she was "dumb" for not speaking English. *Id*. ¶ 57. According to Romero, Kalogeras and Defendant Bivona's sexual comments and harassment altered her working conditions and caused her to suffer extreme emotional distress, anxiety, and a reduced quality of life. *Id*. ¶ 58.

### 3.    *Dora Alicia Garcia Ascenio*

Plaintiff Ascenio is of Ecuadorian ancestry and was employed by Defendants as a dishwasher from approximately March 2015 to December 2016. *Id*. ¶¶ 59, 60. At all relevant times, she was directly supervised by Kalogeras. *Id*. ¶ 61. During her employment, Plaintiff Ascenio was "constantly rushed…when she would try to take a meal break" during her shifts. *Id*. ¶ 63. In the instances when she was able to take a meal break, Kalogeras "often" forced her to stand and would yell at her to hurry up. *Id*. According to Plaintiff Ascenio, Kalogeras "regularly" yelled and cursed at her. *Id*. ¶ 64. Plaintiff Ascenio claims that Kalogeras "regularly" called her derogatory and demeaning names, such as "mojado" (wetback), "tortuga"

(turtle), and "malagradecido" (ungrateful), despite her asking him not to. *Id.* Kalogeras also attempted to intimidate Plaintiff Ascenio by telling her that she and other Plaintiffs would likely be "swept up" in an immigration raid. *Id.* ¶ 65. Kalogeras also scolded Plaintiff Ascenio for speaking in Spanish with her co-workers. *Id.* Plaintiff Ascenio claims that she constantly felt demoralized, insulted, and discriminated against throughout her employment. *Id.* ¶ 66.

### 4. *Jose Antonio Barrientos*

Plaintiff Barrientos is of Ecuadorian descent and was employed by Defendants as a dishwasher, food preparer, assistant chef, and line cook from approximately 1999 to December 2016. *Id.* ¶¶ 66, 67. At all relevant times, he was directly supervised by Kalogeras. *Id.* ¶ 68. During his employment, Plaintiff Barrientos was denied any breaks during his shifts. *Id.* ¶ 71. In the instances when he was able to take a meal break, Barrientos was provided with only a few minutes to eat and would have to do so standing. *Id.* Barrientos claims that he was not permitted to choose from the various options on the menu and was limited to eating fried eggs and french fries. *Id.* When he did eat food other than that which was permitted, Kalogeras would comment, "you don't get to eat that food in your country, so why should you get to eat it here?" up to several times a week. *Id.* On a "daily basis," when Plaintiff Barrientos used the restroom, Kalogeras would knock on the door and yell, "hurry up, we are busy!" *Id.* ¶ 74. On one occasion, Kalogeras told Plaintiff Barrientos that in his country, people had to go to the mountains to "do [their] business," however, "here in America [you] sleep in the bathrooms." *Id.*

Plaintiff Barrientos further claims that Kalogeras and Defendant Bivona "regularly" yelled at or called him derogatory names, such as "mojados" (wetbacks) or "motherfucking malagradecidos" (ungrateful ones). *Id.* ¶ 75. In response to Plaintiff Barrientos' questions,

Kalogeras commented, "fucking mojados" or "you think you're so big but you're just a fucking mojado." *Id*. On more than one occasion, Kalogeras told Barrientos that he hoped immigration authorities, or Immigration and Customs Enforcement, would come and take "los mojados." *Id*. According to Barrientos, Kalogeras threatened him that "if you complain (about my treatment), I will call immigration officials on you." *Id*. ¶ 72. Sometime in 2012, Plaintiff Barrientos claims that he injured himself on the job and sought assistance from Kalogeras. *Id*. ¶ 77. Kalogeras discouraged him from seeking medical treatment and insinuated that immigration authorities would seek him out as a consequence. *Id*. ¶ 77. Barrientos heard Kalogeras similarly discourage other injured Latino/a staff from seeking medical treatment by intimidating and threatening them with references to immigration officials. *Id*.

Plaintiff Barrientos also claims that he was unreasonably denied requests for time off, regardless of how far in advance the time was requested or whether it was for vacation or sick leave. *Id*. ¶¶ 73, 76. In his last year of employment, Plaintiff Barrientos requested two days off from work and gave two-week notice; however, Kalogeras only gave him one day off. *Id*. ¶ 76. According to Plaintiff Barrientos, upon information and belief, Kalogeras did not deny white employees reasonable sick leave. *Id*. Barrientos asserts that the discriminatory treatment he was subjected to on account of his race, ethnicity and national origin caused him severe emotional distress and reduced his quality of work and life. *Id*. ¶ 78.

### 5. *Estela Flores*

Plaintiff Flores is of Mexican descent and was employed by Defendants as a waitress from approximately 2000 to December 2016. *Id*. ¶¶ 79, 80. At all relevant times, she was directly supervised by Kalogeras. *Id*. ¶ 68. Flores claims that Kalogeras "repeatedly" called her derogatory and demeaning names which made her feel objectified. *Id*. ¶ 83. For example, on

one occasion, Kalogeras yelled "ballena" (whale) across the restaurant at Plaintiff Flores.  *Id*.
Kalogeras also called her "mojada" (wetback), "malagradecida" (ungrateful woman), and an
"illegal."  *Id*. ¶ 85.  On "several occasions," Kalogeras propositioned Plaintiff Flores and other
female employees for sex in front of each other.  *Id*. ¶ 84.  Kalogeras also frequently made sexual
comments about other female employees' bodies in front of Flores which she says made her feel
uncomfortable.  *Id*.  Flores asserts that Kalogeras "yelled at [her] so harshly and frequently in
front of others that even customers who witnessed his behavior would approach Plaintiff Flores
to express their disgust."  *Id*. ¶ 86.  According to Flores, the sexual harassment, hostile and
offensive language and behavior she was subjected to was pervasive, harmful, and negatively
altered her work environment, including causing her severe emotional distress and anguish.  *Id*.
¶ 87.

### 6.      *Rocio Gonzalez*

Plaintiff Gonzalez is of Mexican descent and was employed by Defendants as a waitress
from approximately 2010 to December 2016.  *Id*. ¶¶ 88, 89.  At all relevant times, she was
directly supervised by Kalogeras and frequently interacted with Defendant Bivona after he
became the owner of Ba-Kal Restaurant.  *Id*. ¶ 90.  During her employment, Gonzalez was
refused breaks by Kalogeras.  *Id*. ¶ 92.  When she complained to Kalogeras, he would tell her
that she should be grateful to him because he could replace her with other workers if he "just
went to the 7/11 (store)."  *Id*.  Gonzalez claims that Defendant Bivona harassed and attempted to
intimidate her and other Latino/a employees by saying that they owed him money to compensate
for the taxes that he was required to pay as an employer.  *Id*. ¶ 93.  She also asserts that she
stopped receiving wages from Defendants sometime in August 2016.  *Id*. ¶ 94.  When Plaintiff
Gonzalez complained to Defendant Bivona about this, Bivona responded that he did not care if

she sued him because he had been in jail before and that he was part of the mafia.  *Id*.  Sometime in December 2016, Gonzalez overheard Defendant Bivona threaten that he would kill his attorney and his attorney's family if the money issues related to the diner were not resolved.  *Id*. Gonzalez claims that Defendant Bivona's openly violent threats were made to dissuade her and others from demanding their wages and contributed to the pervasive climate of hostility, intimidation, and fear directed at the Plaintiffs.  *Id*.  She further claims that Bivona's behavior caused her severe emotional distress, fear, anxiety and stress.  *Id*. ¶ 95.

### 7.  *Gloria Lalvay*

Plaintiff Lalvay is of Ecuadorian ancestry and was employed by Defendants as a busser from approximately September 2010 to October 2016.  *Id*. ¶¶ 96, 97.  At all relevant times, Lalvay was directly supervised by Kalogeras.  *Id*. ¶ 98.  Kalogeras called Plaintiff Lalvay demeaning names, such as "ballena" (whale), "gorda" (fat), "tortuga" (turtle), "panzona" (big-bellied), and "tragona" (heavy and gluttonous eater) during her employment.  *Id*. ¶ 100.  She claims that Kalogeras yelled these names at her in front of others in the restaurant on a "weekly basis," which made her feel shame and humiliation.  *Id*.  He "repeatedly" made comments regarding Lalvay's eating habits.  *Id*. ¶ 102.  For example, Kalogeras would compare her eating habits to others and tell her that she "ate way too much" and that Ecuadorians in general were "comelones" (gluttonous eaters).  *Id*.

Plaintiff Lalvay also claims that Kalogeras propositioned her and other female employees for sex, publicly and privately.  *Id*. ¶¶ 103-104.  On "multiple occasions," Kalogeras called her to isolated locations, including his office or outside the restaurant where no one else was nearby, would show her money, and say "this is for you Gloria."  *Id*.  According to Plaintiff Lalvay,

Kalogeras was insinuating that he would pay her to perform sexual acts. *Id*. Lalvay repeatedly stated that she he was not interested in Kalogeras's offer. *Id*.

Plaintiff Lalvay further asserts that she stopped receiving wages from Defendants in August 2016. *Id*. ¶ 104. On one occasion, she informed Kalogeras that she was going to contact the New York State Department of Labor to recover her wages. *Id*. Kalogeras responded that she would be the one to "get in trouble" and referenced the immigration authorities. *Id*. When local police officers would come into the restaurant for service, Kalogeras would tell Plaintiff Lalvay that "immigration [authorities] are here." *Id*. ¶ 101. According to Lalvay, this was "an attempt to intimidate and silence her … from speaking out against discriminatory treatment." *Id*. She claims that she did indeed feel intimidated by Kalogeras' threats. *Id*. ¶ 104. The hostile work environment, humiliation and harmful treatment she says she was subjected to caused her severe emotional distress and reduced her quality of work and life. *Id*.

### 8.    *Manuel Morocho*

Plaintiff Morocho is of Ecuadorian descent and was employed by Defendants as a dishwasher and food preparer from approximately 2002 to December 2016. *Id*. ¶¶ 106, 107. At all relevant times, he was directly supervised by Kalogeras. *Id*. ¶ 108. During his employment, Plaintiff Morocho was denied meal breaks. *Id*. ¶ 116. He says he was forced to discretely ask the chefs for food and to eat his meals standing as he worked. *Id*. When Kalogeras caught Morocho eating, he would yell "you are here to work," and he would tell Morocho that he could not sit down. *Id*. Several times, Kalogeras commented to Plaintiff Morocho "in your country you did not have the food you do here." *Id*. Kalogeras also "regularly" called Morocho derogatory and demeaning names, such as "idiot," "stupid," and "mojados" (wetbacks). *Id*. ¶¶ 110, 114. On a "monthly basis," Morocho heard Kalogeras yell "fucking Hispanics" at the

Latino/a employees. *Id.* ¶ 112. On more than one occasion, he heard Kalogeras yell at the Latino/a employees, "I will fire you all and bring Americans to work for me." *Id.* When Kalogeras heard Morocho speaking Spanish, Kalogeras would call him a "moron" and tell him that he needed to learn English. *Id.* ¶ 115.

Although it was not a part of Morocho's job responsibilities as dishwasher, Kalogeras made Morocho clean the bathroom. *Id.* ¶ 111. On one occasion, after Plaintiff Morocho was forced to clean the bathroom, Kalogeras forcefully grabbed his shirt and screamed in his face about a piece of toilet paper left behind on the bathroom floor. *Id.* Morocho states that he was mortified and frightened by what he perceived as unreasonably violent behavior. *Id.* According to Morocho, Kalogeras would often yell at many of the Latino/a employees, including Morocho, for unknown reasons. *Id.* ¶ 112. Kalogeras also yelled at him whenever he requested a day off from work. *Id.* ¶ 113. Kalogeras would inquire about the reason why Plaintiff Morocho had to take the day off and then would criticize his response. *Id.* Morocho states that he observed Kalogeras questioning other Latino/a employees who requested time off, but did not observe him question the white employees in the same manner. *Id.* According to Plaintiff Morocho, he suffered a great amount of anxiety and stress due to Kalogeras' rude and harassing behavior. *Id.* ¶ 114.

### 9.   *Hermelinda Ramos*

Plaintiff Ramos is of Mexican descent and was employed by Defendants as a waitress from approximately September 2016 to December 2016. *Id.* ¶¶ 117, 118. At all relevant times, she was directly supervised by Kalogeras. *Id.* ¶ 119. During Ramos' employment, Kalogeras "often" yelled at her about the cleanliness of her tables in the seating area. *Id.* ¶ 121. According to Ramos, white wait staff were not scolded for failing to clean their tables. *Id.* Plaintiff Ramos

alleges that Kalogeras told her that she must stop speaking Spanish. *Id*. ¶ 122. She also asserts that Kalogeras subjected her to sexual comments and harassment. *Id*. ¶ 123. For example, on one occasion, Kalogeras told her that "he was going to give it to [her]" and "[she] was going to like it," which Plaintiff Ramos understood as a reference to a sexual act. *Id*. This comment made Plaintiff Ramos so uncomfortable that she wanted to resign. *Id*. On another occasion, she heard Kalogeras saying that one of her female co-workers needed "three to four Black guys to bring her blood pressure down" while he simultaneously made a gyrating hip motion. *Id*. ¶ 124. Kalogeras also referred to Ramos, her female co-workers, and other female customers as "puta" (bitch) or "culo" (ass) and often "stared lingeringly" at her which made her feel uncomfortable. *Id*. ¶¶ 124, 126. According to Ramos, the hostile work environment and sexual harassment that she witnessed and was subjected to caused her to suffer severe emotional distress and reduced her quality of work and life. *Id*. ¶ 127.

### 10.   *Elias Varela*

Plaintiff Varela is of Salvadoran descent and was employed by Defendants as a dishwasher from approximately October 2016 to December 2016. *Id*. ¶¶ 128, 129. At all relevant times, he was directly supervised by Kalogeras. *Id*. ¶ 119. During his employment, Plaintiff Varela was denied any breaks. *Id*. ¶ 135. Kalogeras glared at Varela throughout the day and yelled at him whenever Varela attempted to take a meal break during his shift. *Id*. Varela was forced to hide in the restaurant to eat. *Id*. He claims that Kalogeras was hostile and offensive towards him and other Latino employees who worked in the kitchen. *Id*. ¶ 131. Varela says that he observed Kalogeras harass other Latino cooks by not allowing them breaks during their long shifts. *Id*.

13

Kalogeras called Plaintiff Varela derogatory names, such as "mojados" (wetbacks). *Id.* ¶ 132. Whenever Plaintiff Varela would wash dishes, Kalogeras would approach him and say, "why don't you hurry up mojado?" *Id.* Kalogeras also harassed Varela about the state of the bathrooms, even though that was not a part of Varela's job responsibilities. *Id.* ¶ 133. Regardless of what he was doing at the time, Varela claims Kalogeras would often approach him and insist that he check the bathrooms. *Id.* Even after doing so, Kalogeras would reprimand Varela within minutes, telling him that he needed to monitor the status of the bathroom at all times. *Id.* According to Varela, upon information and belief, no white employees were given a routine bathroom assignment. *Id.* Plaintiff Varela also observed Kalogeras publicly reprimand and demean his Latina co-workers who were forced to clean the women's restroom. *Id.* ¶ 134. Kalogeras's conduct made Varela feel demoralized and uncomfortable. *Id.* According to Plaintiff Varela, the treatment he received and witnessed of other Latino/a employees directly harmed him and reduced his quality of work and life. *Id.* ¶ 135.

### B.    Procedural Background

Plaintiffs filed charges, including violations of Title VII based on race, national origin, ethnicity and sex with the U.S. Equal Opportunity Commission ("EEOC") on July 27, 2017. *See* Compl. ¶ 27. On September 25, 2018, Plaintiffs received a Right-to-Sue Notice from the EEOC "indicating the agency had made an adverse inference and that Defendant Princess Diner engaged in unlawful discrimination." *Id.* Plaintiffs then commenced this action on December 21, 2018. *Id.* Service of the Summons and Complaint was thereafter effectuated on Defendants on March 20 and March 21, 2019. *See* DE 17, 21. As a result of Defendants' failure to timely answer or otherwise respond to the Complaint, Plaintiff requested that a Certificate of

Default be entered by the Clerk of the Court and the Certificate was entered against Ba-Kal Restaurant Corporation and Richard Bivona on July 22, 2019. *See* DE 35.

On July 26, 2019, Plaintiffs moved for entry of default judgment against the Defendants. *See* DE 36. Because Plaintiff's motion did not include sufficient testamentary and/or documentary evidence to support the damages requested in the default judgment, the motion was denied without prejudice and with the right to re-file. *See* Electronic Order, dated January 17, 2020. On February 14, 2020, Plaintiffs renewed their motion for entry of default judgment. *See generally* Pls.' Mem. The current motion seeks an award of $483,000 in compensatory damages for emotional distress and pain and suffering, $143,000 in punitive damages, $121,071.10 in attorneys' fees, and $1,527.95 in costs. *Id*. at 44. In support of the motion for default judgment, Plaintiffs submitted, among other things, the following declarations as well as the exhibits attached to each: Declaration of Natasha Lycia Ora Bannan, Esq. ("Bannan Decl.") [DE 47-3], Declaration of Nathalia Alejandra Varela, Esq. ("Varela Decl.") [DE 47-4], Declaration of Dora Alicia Garcia Ascenio ("Ascenio Decl.") [DE 47-5], Declaration of Gloria Lalvay ("Lalvay Decl.") [DE 47-6], Declaration of Jose Antonio Barrientos ("Barrientos Decl.") [DE 47-7], Declaration of Manuel Morocho ("Morocho Decl.") [DE 47-8], Declaration of Hermelinda Ramos ("Ramos Decl.") [DE 47-9], Declaration of Lenny Romero ("Romero Decl.") [DE 47-10], Declaration of Lina Tenecora ("Tenecora Decl.") [DE 47-11], Declaration of Rocio Gonzalez ("Gonzalez Decl.") [DE 47-12], Declaration of Estela Flores ("Flores Decl.") [DE 47-13], and Declaration of Elias Varela ("Varela Decl.") [DE 47-14].

Judge Hurley referred the motion to this Court for a Report and Recommendation "as to whether Plaintiffs have demonstrated that the allegations in the Complaint establish the Defendants' liability such that the motion for default judgment should be granted, and, if so, to

determine the appropriate amount of damages, costs, and/or fees, if any to be awarded." *See* February 18, 2020 Electronic Order.

### III.    LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process for obtaining a default judgment against a defaulting party. *See Priestley v. Headminder, Inc.*, 647 F.3d 497, 504–05 (2d Cir. 2011); *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)); *Liberty Mut. Fire Ins. Co. v. Zurich Am. Ins. Co.*, 19-cv-414, 2020 WL 871220, at *2 (N.D.N.Y. Feb. 21, 2020). First, a plaintiff must obtain a notation of default indicating that a party has "failed to plead or otherwise defend." Fed. R. Civ. 55(a). Second, upon obtaining a notation of default, "a plaintiff must next seek a judgment by default under Rule 55(b)." *New York v. Green*, 420 F.3d at 104. The decision to grant a motion for default judgment is left to the sound discretion of the district court. *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contrs. Inc.*, 699 F.3d 230, 233 (2d Cir. 2012) (quoting *Finkel*, 577 F.3d at 88)

"Once found to be in default, a defendant is deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability." *Philip Morris USA Inc. v. 5 Bros. Grocery Corp.*, No. 13-CV-2451, 2014 WL 3887515, at *2 (E.D.N.Y. Aug. 5, 2014) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Montcalm Publ'g Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y.1992)); *Krevat v. Burgers to Go, Inc.*, No. 13-CV-6258, 2014 WL 4638844, at *5 (E.D.N.Y. Sept. 16, 2014) (citing *Joe Hand Promotions, Inc. v. El Norteno Rest. Corp.*, No. 06-CV-1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007)). A default judgment entered on the well-pleaded allegations in the complaint establishes a defendant's liability. *See Deckers Outdoor Corp. v. TKM Forest Hills,*

*LLC,* No. 12-CV-5986, 2014 WL 4536715, at *4 (E.D.N.Y. Sept. 11, 2014) (citing *Greyhound ExhibitGroup. Inc*., 973 F.2d at 158).

However, "just because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." *Profi-Parkiet Sp. Zoo v. Seneca Hardwoods LLC,* No. 13-CV-4358, 2014 WL 2169769, at *3 (E.D.N.Y. May 23, 2014) (quoting *Mktg. Devs., Ltd. v. Genesis Imp. & Exp., Inc.,* No. 08-CV-3168, 2009 WL 4929419, at *6 (E.D.N.Y. Oct. 6, 2009)) (internal quotation marks omitted), *report and recommendation adopted by* 2014 WL 2765793 (E.D.N.Y. Jun. 18, 2014)); *Local 1922 Pension Fund v. Broadway Electric Supply, Co., Inc*., CV 19-2344, 2020 WL 1931635, at *4 (E.D.N.Y. Mar. 18, 2020); *Bravado Int'l Grp. Merchandising Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 186 (E.D.N.Y. 2009) (citing *Erwin DeMarino Trucking Co. v. Jackson*, 838 F. Supp. 160, 162 (S.D.N.Y. 1993)).  Rather, "it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action." *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (collecting cases); *see also Said v. SBS Elecs., Inc.*, No. 08-CV-3067, 2010 WL 1265186, at *2 (E.D.N.Y. Feb. 24, 2010) (The fact that a complaint remains unanswered will not suffice to establish liability on the plaintiff's claims since "a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading."), *adopted as modified on unrelated grounds*, 2010 WL 1287080 (E.D.N.Y. Mar. 31, 2010).

"As the Second Circuit has noted, when determining whether to grant a default judgment, the Court is guided by the same factors which apply to a motion to set aside entry of a default." *Krevat*, 2014 WL 4638844, at *5 (citation omitted).  "These factors are: (1) 'whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the

denial of the motion for default judgment.'"  *Id.* (quoting *Tr. of Empire State Carpenters Annuity, Apprenticeship, Labor Mgmt. Cooperation, Pension and Welfare Funds v. Flooring Experts, Inc.*, No. 12-CV-6317, 2013 WL 4042357, at *2 (E.D.N.Y. Aug. 8, 2013), *report and recommendation adopted by* 2013 WL 4761151 (E.D.N.Y. Sept. 3, 2013)); *see also Reliance Commc'ns LLC v. Retail Store Ventures, Inc.,* No. 12-CV-2067, 2013 WL 4039378, at *2 (E.D.N.Y. Aug. 7, 2013) (quoting *Mason Tenders Dist. Council v. Duce Constr. Corp*., No. 02-CV-9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003)).

## IV.    DEFAULT JUDGMENT

### A.    Willfulness

When a defendant is continually and "entirely unresponsive," the defendant's failure to respond is considered willful.  *See Trs. of the Pavers and Rd. Builders Dist. Council Welfare, Pension, Annuity and Apprenticeship, Skill Improvement and Safety Funds v. JREM Constr. Corp.*, No. 12-CV-3877, 2013 WL 618738 at *3 (E.D.N.Y. Jan. 28, 2013); *Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, No. 06-14226, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008) (citing *Duce Constr. Corp*., 2003 WL 1960584, at *2).  Therefore, a defendant's failure to appear or respond equates to a willful default.  *J & J Sports Prods., Inc. v. Vergara*, No. 19-CV-2382, 2020 WL 1034393, at *7 (E.D.N.Y. Feb. 6, 2020), *report and recommendation adopted sub nom. J&J Sports Prods. Inc. v. Vergara*, No. 19-CV-2382, 2020 WL 1031756 (E.D.N.Y. Mar. 3, 2020); *see also Elgard Corp. v. Brennan Const. Co.*, 248 Fed. App'x 220, 222 (2d Cir. 2007); *McFarlane v. Harry's Nurses Registry,* 17-CV-6350, 2020 WL 1643781, at *16 (E.D.N.Y. Apr. 2, 2020); *W. Coast 2014-7, LLC v. Portillo-Pena*, No. 15-CV-6036, 2016 WL 4506749, at *5 (E.D.N.Y. Aug. 5, 2016), *report and recommendation adopted*, No. 15-CV-6036, 2016 WL 4507003 (E.D.N.Y. Aug. 26, 2016).

Here, Plaintiffs have submitted Affidavits of Service from the process server demonstrating that Defendants were duly served with the Summons and Complaint. *See* DE 17, 20. Despite service having been properly effectuated, neither of the Defendants answered nor responded in any way to the Complaint, nor did they request an extension of time to do so. There is no indication that Defendants' failure to respond to the Complaint, despite being properly served, was anything but deliberate and willful. *See, e.g., S.E.C. v. McNulty*, 137 F.3d 732, 738-39 (2d Cir. 1998); *Indymac Bank*, 2007 WL 4468652, at *1; *DiPaolo*, 466 F. Supp. 2d at 482.

**B.    Meritorious Defense**

Turning to the next factor, the Court is unable to make a determination whether Defendants have a meritorious defense since no such defense has been presented to the Court. *See Bridge Oil Ltd.*, 2008 WL 5560868, at *2 (citing *Duce Constr. Corp.*, 2003 WL 1960584, at *2); *Empire State Carpenters Welfare v. Darken Architectural Wood*, No. 11-CV-0046, 2012 WL 194075, at *3 (E.D.N.Y. Jan. 17, 2012), *report and recommendation adopted*, 2012 WL 832452 (E.D.N.Y. March 12, 2012). "Where a defendant has not filed an answer, there is no evidence of any defense." *Augustin v. Apex Fin. Mgmt.,* No. 14-CV-0182, 2015 WL 5657368 at *4 (E.D.N.Y. July 27, 2015) (internal quotation marks and citation omitted), *report and recommendation adopted*, No. 14-CV-0182, 2015 WL 7430008 (E.D.N.Y. Nov. 23, 2015). Here, despite having been served, Defendants did not file any answer to the Complaint. Therefore, there is no evidence of any meritorious defense that Defendants may have against Plaintiffs' claims. *See J & J Sports Prods.*, 2020 WL 1034393, at *7.

Notwithstanding a defendant's failure to respond to a complaint, a plaintiff still must demonstrate that the factual allegations set forth in the complaint state valid claims for

relief. *Myers*, 236 F. Supp. 3d at 708; *see also Said*, 2010 WL 1265186, at *2 ("With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action."); *Gunawan v. Sake Sushi Rest.,* 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) ("The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading."); *J & J Sports Prods., Inc. v. Daley*, No. 06-CV-0238, 2007 WL 7135707, at *3-4 (E.D.N.Y. Feb. 15, 2007) ("[C]onclusory allegations based on information and belief" are insufficient to support a finding of default-based liability). "[P]rior to entering default judgment, a district court is 'required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law.'" *Mickalis Pawn Shop,* 645 F.3d at 137 (quoting *Finkel,* 577 F.3d at 84). The Court now turns to the sufficiency of the allegations in the Complaint.

### 1.   *Sex Based Discrimination under Title VII and the NYSHRL*

In Counts I and V of the Complaint, Plaintiffs Tenecora, Romero, Flores, Lalvay, and Ramos assert claims for discrimination on the basis of sex against Defendants Ba-Kal Restaurant and Richard Bivona in violation of Title VII and the NYSHRL. Compl. ¶¶ 137-141, 161-165. Title VII of the Civil Rights Act of 1964 provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). The NYSHRL similarly provides that "[i]t shall be an unlawful discriminatory practice [f]or an employer or licensing agency, because of an individual's ... sex ... to discriminate against such individual in compensation or in terms,

20

conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). Both Title VII and the NYSHRL have been construed to encompass claims for being required to work in a "discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Croci v. Town of Haverstraw*, 44 N.Y.S.3d 546, 547-48, 146 A.D. 3d 748 (App. Div. 2d Dep't 2017) (noting that such a claim may be brought under Section 296).

Sexual harassment by a supervisor in the workplace based on the subordinate's sex violates Title VII's prohibition against sex discrimination. *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174-175 (2d Cir. 2012). Sexual harassment which constitutes sex discrimination under Title VII falls within two categories: *quid pro quo* sexual harassment and hostile work environment. *Crosby v. Homeowner Assistance Servs. of New York,* No. 14-CV-3459, 2015 WL 3466855, at *2 (E.D.N.Y. Feb. 18, 2015), *report and recommendation adopted by* No. 14-CV-3459, 2015 WL 3468606 (E.D.N.Y. June 1, 2015) (citing *Schiano v. Quality Payroll Sys.,* 445 F.3d 597, 603–04 (2d Cir.2006)). *Quid pro quo* sexual harassment involves situations in which "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual." *Id*. (citing *Perks v. Town of Huntington,* 251 F. Supp. 2d 1143, 1154–55 (E.D.N.Y.2003)). Under a hostile work environment theory, a plaintiff must show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003) (quoting *Alfano*, 294 F.3d at 373 (2d Cir. 2002)); *see also Cavalotti v. Daddyo's BBQ, Inc*., No. 15-CV-6469, 2018 WL 5456654, at *20 (E.D.N.Y. Sept. 8, 2018) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

"In considering whether a plaintiff has met this burden, courts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012) (citation and internal quotation marks omitted). The kinds of workplace conduct that may be actionable under Title VII ... include 'unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Redd*, 678 F.3d at 175 (quoting *Meritor*, 477 U.S. at 65).  A plaintiff also must show that the hostile environment was due to the protected class to which she belongs.  *Shukla v. Deloitte Consulting LLP*, No. 19-CV-10578, 2020 WL 3181785, at *9 (S.D.N.Y. June 15, 2020); *see also Vega v. Dep't of Educ.*, No. 18-CV-6221, 2020 WL 1505564, at *10 (S.D.N.Y. Mar. 30, 2020).  Moreover, a corporation "is presumptively liable for sexual harassment in violation of Title VII if the plaintiff was harassed ... by someone with supervisory ... authority over the plaintiff." *Redd*, 678 F.3d at 182.

Accepting the well-pleaded allegations in the Complaint as true, the Court finds that Plaintiffs Tenecora, Romero, Flores, Lalvay, and Ramos were subjected to a hostile work environment based on their sex.  The nature and frequency of the comments and actions of Kalogeras and Defendant Bivona toward Plaintiffs Tenecora, Romero, Flores, Lalvay, and Ramos, as summarized in greater detail above (*see* Section II.A(1), (2), (5), (7) and (9), *supra*), as described can be considered "severe or pervasive."  Kalogeras repeatedly made graphic sexual comments to Tenecora, Romero, Flores, Lalvay and Ramos and propositioned them for sex for himself or Defendant Bivona in exchange for money or advancement in the workplace.  Compl. ¶¶ 43, 54-55, 84, 103-104, 121-123; *Gutierrez v. Taxi Club Mgmt*, No. 17-CV-0532, 2018 WL 3432786, at *4 (E.D.N.Y. June 25, 2018), *report and recommendation adopted sub nom. Gutierrez v. Taxi Club Mgmt.*, Inc., No. 17-CV-0532, 2018 WL 3429903 (E.D.N.Y. July

16, 2018) (finding that supervisor's persistent sexual comments and advances were sufficient to state a claim for sexual harassment). Defendant Bivona also invited Plaintiff Tenecora to his home on her days off or when the restaurant was closed. *Id*. ¶¶ 44-43.

Kalogeras "regularly" called Plaintiffs Tenecora, Romero, Flores, Lalvay, and Ramos sexually derogatory and demeaning names, including, among others, "ballena" (whale), "gorda" (fat), "panzona" (big-bellied), "puta" (bitch), or "culo" (ass). *Id*. ¶¶ 37, 83, 85, 100, 124; *see also Setty v. Fitness*, No. 17-CV-6504, 2018 WL 8415414, at *5 (E.D.N.Y. Dec. 18, 2018), *report and recommendation adopted sub nom. Setty v. Synergy Fitness*, No. 17-CV-6504, 2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019) (finding that statements to plaintiff, such as "little cutie," a "bitch" and "faggit [sic]", were "demeaning in nature [and] clearly contributed to the hostile work environment"). He "frequently" made demeaning remarks about their bodies and the bodies of their female coworkers. *Id*. ¶¶ 40-42, 84. Kalogeras would often stare at Plaintiffs Tenecora and Ramos' bodies for extended periods of time such that it made them feel uncomfortable. *Id*. ¶¶ 40, 126. Although this conduct might upon first glance seem facially neutral, it is relevant to the totality of the circumstances of the Plaintiffs' hostile work environment claim. *See Alfano,* 294 F.3d at 378 ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex."). Moreover, even when they were not the subjects of Kalogeras' conduct, on several occasions, Plaintiffs Tenecora, Romero, Flores, Lalvay, and Ramos witnessed Kalogeras make sexual comments to or proposition their female coworkers. *Id*. ¶¶ 41-42, 84, 103-104, 124; *see also Setty*, 2018 WL 8415414, at *6 (finding that witnessing misconduct directed at others lends further support to plaintiffs' hostile work environment claims); *Kaytor v. Elec. Boat Corp.*,

23

609 F.3d 537, 547 (2d Cir. 2010) ("[A] plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.") (citation omitted).

Based on the totality of the circumstances here, Plaintiffs have alleged conduct sufficiently "severe or pervasive" as to alter their working conditions and which constitutes a hostile work environment. *See Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-7114, 2017 WL 9487194, at *6 (E.D.N.Y. Aug. 23, 2017), *report and recommendation adopted*, No. 14-CV-7114, 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017) (finding that supervisor's comments about plaintiff's appearance and clothing and aggressive and explicit requests that plaintiff engage in sexual relations with him created a hostile work environment); *Rodriguez v. Express World Wide, LLC*, No. 12-CV-4572, 2014 WL 1347369, at *3 (E.D.N.Y. Jan. 16, 2014), *report and recommendation adopted*, No. 12-CV-4572, 2014 WL 1350350 (E.D.N.Y. Mar. 31, 2014) (finding that supervisor who instructed plaintiff to dress and act in a sexual manner while working, made numerous sexual advances to her, and indicated his intent to have a sexual relationship with her created a hostile work environment); *Joseph v. HDMJ Rest., Inc.,* 970 F. Supp. 2d 131, 145 (E.D.N.Y. 2013) (finding that plaintiff established a hostile work environment when supervisor "constantly called Plaintiff racially and sexually derogatory names and requested oral sex from Plaintiff").

Accordingly, the Court finds that the factual allegations set forth in the Complaint, accepted as true at this stage, state valid claims for discrimination based on sex in violation of Title VII and the NYSHRL.[4]

---

[4]    Title VII does not encompass individual liability.  However, under the NYSHRL, individual liability may attach where the person has an ownership interest in the employer corporation.  *See Taxi Club Mgmt*, 2018 WL 3432786, at *4 (collecting cases).  As the owner of

### 2. *Race Based Discrimination Claims under Title VII, the NYSHRL, and Section 1981*

Plaintiffs claim that Defendants Ba-Kal Restaurant and Richard Bivona discriminated against them and subjected them to a hostile work environment based on their race, ethnicity, and/or national origin in violation of Title VII, the NYSHRL and Section 1981. Compl. ¶¶ 142-160, 166-178. A hostile work environment is one form of disparate treatment on the basis of race or national origin prohibited under Title VII. *See Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001). Thus, Plaintiffs may establish their race-based discrimination claims under Title VII "either by (1) by showing that [they] ha[ve] suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race ... or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York*, 336 F.3d 138, 149 (2d. Cir. 2004).

Section 1981 provides a cause of action for discrimination on the basis of race, but not on the basis of national origin. *See* 42 U.S.C. § 1981; *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016). Courts apply the same standard in analyzing Title VII, the NYSHRL, and Section 1981 race discrimination claims. *See Francis*, 2018 WL 4292171, at *5 (citations omitted); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (noting that "[a]lthough the §1981 claim is against [the individual defendant] and the Title VII and NYSHRL claims are against the School District, the analysis is the same"); *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014) ("Disparate treatment claims brought under Title VII, Section 1981, and the NYSHRL are all analyzed under the same standard.").

---

Defendant Ba-Kal Restaurant, Compl. ¶ 22, 46, Defendant Bivona is individually liable under the NYSHRL.

Corporate defendants face liability under Title VII, the NYSHRL and Section 1981, but there is no *personal* liability under Title VII. *Id.* An individual defendant can be found liable under Section 1981 where individual liability is "predicated on the [defendant's] personal involvement" in intentional discrimination. *Tardd v. Brookhaven Nat'l Laboratory*, 497 F. Supp. 2d 404, 411-12 (E.D.N.Y. 2006) (quoting *Whidbee*, 223 F.3d at 75). The Court now turns to the sufficiency of the allegations pleaded in support of Plaintiffs' race based discrimination and hostile work environment claims under the three statutes.

### i.  Hostile Work Environment Claims under Title VII and the NYSHRL

In Counts II and VI of the Complaint, Plaintiffs assert claims against Defendants Ba-Kal Restaurant and Richard Bivona for hostile work environment based on race, ethnicity, and national origin in violation of Title VII and/or the NYSHRL. Compl. ¶¶ 142-146, 166-170. "An employer violates Title VII when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020). As noted, courts consider the totality of circumstances in determining whether an objectively hostile work environment exists, including: the frequency of the discriminatory conduct; its severity; whether it is threatening and humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Feingold,* 366 F.3d at 150. To be deemed "pervasive," a defendant's conduct must be "sufficiently continuous and concerted." *Id.* (quoting *Alfano*, 294 F.3d at 374). An isolated incident, however, can constitute a hostile work environment if it is sufficiently severe. *Id.* In addition, the plaintiff must have "subjectively perceive[d]" the conditions of the

workplace to be abusive and show that misconduct occurred because of plaintiff's protected characteristic. *Feingold*, 366 F.3d at 149; *Alfano*, 294 F.3d at 374.

Accepting all the well-pleaded allegations in the Complaint as true, the Court finds that Plaintiffs Tenecora, Romero, Ramos, Lalvay, Flores, Ascenio, Barrientos, Morocho, Gonzalez and Varela were subjected to a hostile work environment based on their race. As to Plaintiffs Tenecora, Romero, Lalvay, Ramos and Flores, for the same reasons provided above in Section IV.B(1), *supra* (*e.g.*, graphic sexual comments, propositioning Latina employees for sex in exchange for money or advancement in the workplace, use of sexually and racially derogatory and demeaning names, sexually suggestive body motions, etc.), Kalogeras' conduct toward them was sufficiently "severe or pervasive" as to alter the working conditions and create a hostile work environment.

As to Plaintiffs Ascenio, Barrientos, Morocho, Gonazalez and Varela, each allege that Kalogeras: (1) denied them meal or shift breaks during the course of their employment, Compl. ¶¶ 63, 68, 92, 116, 113; (2) forced them stand and work whenever they ate, *id.* ¶¶ 64, 71, 116; (3) "regularly" called them demeaning names and referred to them by the racially derogatory term "mojados," *id.* ¶¶ 64, 75, 92, 112, 132; and (4) "regularly" yelled at them, *id.* ¶ 64, 75, 135, 112-113 -- things that he did not do to Caucasian employees. Plaintiffs Ascenio and Barrientos further allege, among other things, that Kalogeras made intimidating comments to them on several occasions regarding the prospect of being detained by immigration authorities during their shift or if they asserted their employment rights. *Id.* ¶¶ 65, 75, 77. Plaintiff Morocho and Varela also assert that Kalogeras "frequently" antagonized them about cleaning the bathroom, which on one occasion resulted in Kalogeras grabbing Plaintiff Morocho by the collar and yelling in his face over a piece of toilet paper left behind on the floor. *Id.* ¶¶ 116, 132. Although

some of Kalogeras' conduct may be considered facially neutral, those acts are nonetheless relevant to assessing the totality of the circumstances.  *See Alfano,* 294 F.3d at 378.  Based on the totality of these circumstances here, the Court finds that Kalogeras' actions toward Plaintiffs Ascenio, Barrientos, Morocho, Gonazalez and Varela went beyond merely offensive conduct and are sufficiently "severe or pervasive" as to alter the working conditions of these Plaintiffs, resulting in a hostile work environment.  *See Franci*s, 2018 WL 4292171, at *6 (finding that repeated use of racial epithets and derogatory terms, denial of breaks and/or inadequate time for breaks, and excessive and aggressive supervision constituted hostile work environment).

The Complaint also sufficiently alleges that Plaintiffs "subjectively perceived" the conditions of the workplace to be abusive and hostile.  These Plaintiffs asserted that they felt, among other things, "anxious," "embarrassed," "demoralized," "uncomfortable," and "emotionally distressed" from the hostile and abusive conduct.  Compl. ¶¶ 40, 43, 58, 66, 78, 84, 94-95, 100, 103, 114, 123-124, 134; *see also Franci*s, 2018 WL 4292171, at *6 (finding that plaintiffs' "subjectively" perceived the conditions of their employment as abusive where they alleged they were "nobody" and "degraded" when defendant verbally intimidated and humiliated them in front of their co-workers and that they were afraid to go to work); *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 186 (S.D.N.Y. 2013) (finding that complaints to management and the plaintiff's testimony that comments made him feel "uncomfortable" and "ashamed" could establish his "subjective experience of his environment as hostile").

Finally, the pleadings sufficiently allege that the conduct complained of was directed toward Plaintiffs because of their race.  An inference of discrimination may be discerned from a variety of circumstances, including "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's invidious comments about others in the employee's

protected group," or "the more favorable treatment of employees not in the protected group." *Dellaporte v. City Univ. of N.Y.,* 998 F. Supp. 2d 214, 227 (S.D.N.Y.2014) (quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (internal citations omitted)).  Here, in addition to referring to Plaintiffs Tenecora, Romero, Lalvay, Ramos and Flores, in sexually derogatory terms (as described in Section IV.B(1), *supra*) Kalogeras also routinely referred to them in racially derogatory terms, such as "espicanita" (female "spic") and "mojada" (wetback), "malagradecida" (ungrateful woman) "tortuga" (turtle), and/or an "illegal" either "repeatedly" or "daily."  Compl. ¶¶ 37, 83, 85, 100, 124-125.  Plaintiff Tenecora also alleges that whenever clients who appeared to be Latino/a entered the restaurant, Kalogeras made comments to her, such as "oh look, your family is here," or "more Mexicans are coming."  *Id*. Plaintiffs Ascenio, Barrientos, Morocho, Gonzaelz and Varela allege that Kalogeras "regularly" called them demeaning names and referred to them by the racially derogatory term "mojados." *Id*. ¶¶ 5,7, 64, 75, 112, 132.

For the foregoing reasons, the Court finds that Plaintiffs have sufficiently shown that the factual allegations set forth in the Complaint state valid claims against the Defendants for hostile work environment based on race and ethnicity in violation of Title VII and/or the NYSHRL.[5]

### ii.    Disparate Treatment Claims Under Title VII, the NYSHRL and Section 1981

In Counts III and VII of the Complaint, Plaintiffs Tenecora, Flores, Gonzalez and Ramos assert claims for disparate treatment on the basis of race, ethnicity, and national origin against Defendants Ba-Kal Restaurant and Bivona in violation of Title VII and/or the NYSHRL.  Compl.

---

[5]    As the owner of Defendant Ba-Kal Restaurant, Defendant Bivona is individually liable under the NYSHRL.  Compl. ¶¶ 22, 46; *see also Taxi Club Mgmt*, 2018 WL 3432786, at *4 (collecting cases).

¶¶ 147-154, 171-178.  In Count IV of the Complaint, Plaintiffs assert a claim for discrimination against Defendants on the basis of race and ethnicity alleging that "the treatment of Plaintiff's was disparate" in violation of Section 1981.  *Id*. ¶¶ 155-160.

"Employment discrimination claims [on the basis of race, ethnicity, and/or national original] brought under Title VII, § 1981, and the NYSHRL are analyzed pursuant to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)."  *Spires v. MetLife Grp., Inc*., No. 18-CV-4464, 2019 WL 4464393, at *4 (S.D.N.Y. Sept. 18, 2019); *see also Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (applying this framework with respect to Title VII and § 1981); *McGill v. Univ. of Rochester*, 600 Fed. App'x 789, 790 (2d Cir. 2015) (applying this framework with respect to Title VII, § 1981, and the NYSHRL); *Bidot v. Cty. of Suffolk*, No. 19-CV-3925, 2020 WL 6385072, at *5 (E.D.N.Y. Aug. 20, 2020), *report and recommendation adopted*, No. 19-CV-3925, 2020 WL 5747197 (E.D.N.Y. Sept. 25, 2020) ("The Court considers Plaintiff's claims under Title VII, § 1983 and § 1981 together in determining the sufficiency of Plaintiff's factual allegations, since the "same framework and pleading standard" govern all of these statutes.") (citing *Awad v. City of New York,* No. 13-CV-5753, 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014) (collecting cases)).

Under the *McDonnell Douglas* framework, to make a prima facie showing of race-based disparate treatment under Title VII, a plaintiff must assert four necessary elements:  "(1) the plaintiff is a member of a protected class; (2) he was qualified for the position held; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the action gave rise to an inference of discrimination."  *Gatto v. Jet Blue Airways*, 09-CV-983, 2010 WL 125974, at *1 (S.D.N.Y. Jan. 13, 2010) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993)).

To adequately plead a disparate treatment claim, a plaintiff must allege "facts that would support an inference that Plaintiff suffered an adverse employment action based upon his race." *Patane v. Clark,* 508 F.3d 106, 112 (2d Cir.2007). The Second Circuit has held that "while a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination … it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2013) (internal citations, alterations, and quotations omitted). Specifically, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311; *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *4 (S.D.N.Y. Aug. 17, 2020) (citation omitted).

Here, Plaintiffs allege that they are Hispanic and, therefore, belong to a protected class. Compl. ¶¶ 29, 50, 60, 68, 80, 89, 97, 107, 118, 129; *see also Vill. of Freeport,* 814 F.3d at 607-08 ("discrimination based on ethnicity, including Hispanicity or lack thereof, constitutes racial discrimination under Title VII" and "*may* also be cognizable under the rubric of national-origin discrimination") (emphasis in original). Although Plaintiffs fail to plead any specific allegations regarding their qualifications, the length of their employment and the basic nature of the tasks they performed suggest that they were qualified for their work as wait staff, cooks and bussers. *See Chance v. Karmacharya*, No. 14-CV-1111, 2017 WL 5515951, at *2 (D. Conn. Mar. 20, 2017) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91–92 (2d Cir. 2001)). As such, Plaintiffs sufficiently allege the first two elements of their discrimination claims.

However, Plaintiffs fail to sufficiently allege an "adverse employment action" under circumstances giving rise to an "inference of discriminatory intent."

An adverse employment action in the context of the anti-discrimination laws is a "materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter,* 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. N.Y.C. Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir. 2004)). The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir. 2006) (citation omitted). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Bowen-Hooks v. City of New York,* 13 F. Supp. 3d 179, 211 (E.D.N.Y. 2014) (citing *Feingold,* 366 F.3d at 152)*; see also Mathirampuzha,* 548 F.3d at 78.

Plaintiffs here allege that they were subjected to at least one of the following forms of conduct by Defendants because of their race: (1) being subjected to derogatory names and comments; (2) being restricted to the types of meals they were permitted to eat off the menu; (3) being denied use of their cell phones during shifts; (4) being scolded for or prohibited from speaking Spanish; (5) being assigned tasks outside of their job responsibilities (*i.e.*, cleaning the bathroom); (6) being scrutinized for failing to complete tasks (*i.e.*, cleaning tables); (7) being denied time off; (8) being denied meal or shift breaks; and (8) being denied wages between August 2016 and December 2016. Compl. ¶¶ 16-17, 33-35, 38, 46, 63, 65, 71, 73, 76, 92, 94, 104, 111-113, 121-122, 133-134, 150. Most of these activities, however, do not constitute adverse employment actions.

First, this Court is not aware of -- and Plaintiffs have failed to cite -- any legal authority which suggests that being subjected to derogatory names and comments, denied certain types of meals off the menu of a restaurant, denied use of a cell phone during shifts, or criticism for (or prohibition from) speaking Spanish constitute a "materially adverse change in the terms and conditions of employment." *See Alfano,* 294 F.3d 365, 373 (2d Cir. 2002) (noting that a materially adverse employment action must have an impact on "some tangible job benefits such as compensation, terms, conditions or privileges of employment."); *Dawson v. Long*, No. 16-CV-1608, 2018 WL 5914859, at *10 (S.D.N.Y. Aug. 20, 2018), *report and recommendation adopted*, No. 16-CV-1608, 2018 WL 4519199 (S.D.N.Y. Sept. 20, 2018) ("There is no evidence suggesting that having to work at the hot seat, filing forms, not receiving administrative rights, receiving write-ups, being called a derogatory name (Patricia), and being asked to work during a meal materially affected [plaintiff's] employment."); *Martinez v. New York City Department of Education*, No. 04-CV-2728, 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008) ("[I]ncidents where [supervisor] publicly yelled at Plaintiff for various reasons or called him 'shit' ... constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable.").  Certainly, the allegations describing the Defendants' conduct toward the Plaintiffs taken as true show that the Defendants often treated the Plaintiffs miserably.  However, while some of these allegations lend support to an inference of discriminatory intent or a hostile work environment claim, Plaintiffs have not alleged any "attendant negative result" from these actions. *Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 506 (S.D.N.Y. 2010) ("A materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity.") (internal quotation and citation omitted).

Second, although it may not have fallen squarely within their job responsibilities, Plaintiffs do not allege that being required to clean the bathrooms constituted a significant departure from their job responsibilities or materially changed their duties. Specifically, Plaintiffs Morocho and Varela allege that they were required to clean and tend to the bathrooms even though it was outside their responsibilities as dishwashers. Compl. ¶¶ 111, 113. However, "[c]hanges in assignments or responsibilities that do not 'radically change' the nature of work are not typically adverse employment actions." *Potash v. Florida Union Free Sch. Dist.,* 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (citation omitted); *Edwards v. Huntington Union Free Sch. Dist.,* 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013) ("[A] change in duties or job reassignment may be an adverse employment action, 'if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.'") (citation omitted). Although "comparatively poor assignments can constitute adverse employment actions," the new assignments must constitute a material change in work duties such that they are "'materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement.'" *Bowen-Hooks*, 13 F. Supp. 3d at 213–14 (citation omitted). Here, Plaintiffs Morocho and Varela have not made any such showing and the Court notes that they were given these assignments *in addition to* their dishwasher responsibilities, not in place of them.

Third, being scrutinized for failing to adequately complete tasks, such as cleaning tables, does not constitute an adverse employment action, absent any materially adverse impact. "[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Id.* (citing *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 570 (2d Cir. 2011)); *see also Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *14 (S.D.N.Y. Mar. 25,

2019) ("Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions.") (citation omitted); *Dawson*, 2013 WL 4504620, at *10 ("Excessive scrutiny, monitoring, and criticisms of her job performance" are not adverse employment actions absent evidence of materially adverse impact); *Cotterell v. Gilmore*, 64 F. Supp. 3d 406, 423–24 (E.D.N.Y. 2014) (It is well-settled that "[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences.").

Fourth, being denied vacation or personal time generally does not rise to the level of an adverse employment action. *See Todoverto v. McDonald*, No. 13-CV-4922, 2016 WL 3826281, at *12 (S.D.N.Y. July 7, 2016) (collecting cases); *Chukwuka v. City of New York*, 795 F. Supp, 2d 256, 261 (S.D.N. Y, 2011) ("In general, the denial of vacation time does not ... rise to the level of an adverse employment action.") *aff'd*, 513 Fed. App'x 34 (2d Cir. 2013) (summary order)); *Gutierrez*, 756 F. Supp. 2d at 508–09 (finding that refusal to grant days off, requiring plaintiffs to adhere more strictly to the dress code than white detectives, and checking up on plaintiffs do not constitute adverse employment actions) (citations omitted). The only Plaintiff for which it is specifically alleged that Kalogeras denied requests for time off is Plaintiff Barrientos, who claims that Kalogeras unreasonably denied him almost all requests for time off, regardless of whether it was for vacation or sick leave.[6]  Compl. ¶¶ 73, 76.  Yet the only factual

---

[6]     This allegation, by itself, is too conclusory to amount to an adverse employment action. *See Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 228 (E.D.N.Y. 2016) (finding plaintiff's allegations that, at unspecified times, he was denied unspecified classroom resources and administrative support and was ostracized from the School science department," to be wholly conclusory and insufficient to raise plaintiff's pleading above the speculative level); *Dowrich–Weeks v. Cooper Square Realty, Inc.*, 535 Fed. App'x 9, 11–12 (2d Cir. 2013) (affirming the district court's finding that the plaintiff, complaining of gender-based discrimination, had failed to sufficiently plead an adverse employment action because she "allege[d] no facts supporting her conclusory assertion that she was 'demoted' "); *Patane v.*

detail pleaded in support of this assertion is a single instance in which Plaintiff Barrientos requested two days off from work in his last year of employment, but was granted only one. *Id*. ¶ 76. "[T]he denial of a single vacation request, without any indication that there was an absolute prohibition against plaintiff taking any vacation time, is not a material adverse employment action." *Chukwuka,* 795 F. Supp. 2d at 262 (quoting *Roff v. Low Surgical & Med. Supply, Inc.,* No. 03-CV-3655, 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004)); *Drouillard v. Sprint/United Mgmt. Co.,* 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019) (same); *Kalp v. Kalmon Dolgin Affiliates of Long Island Inc.,* No. 11-CV-4000, 2013 WL 1232308, at *6 (E.D.N.Y. Mar. 27, 2013) (same); *see also Anderson v. New York City Health & Hosps. Corp.,* No. 16-CV-1051, 2020 WL 2866960, at *23 (S.D.N.Y. Mar. 2, 2020), *report and recommendation adopted,* No. 16-CV-1051, 2020 WL 1528101 (S.D.N.Y. Mar. 31, 2020) ("It is well settled that an employer's refusal to grant days off is not an adverse employment action because 'while such actions may have made the work place unpleasant,' they do not have any 'attendant negative result.'") (citation omitted).

Fifth, this Court is unaware of any legal authority in this Circuit finding the denial of meal or shift breaks, in whole or substantial part, to be an adverse employment action. However, that does not mean that such support does not exist. Notably for their part, Plaintiffs have not cited any legal authority which recognizes these acts as adverse employment actions. Since the

---

*Clark*, 508 F.3d 106, 116 (2d Cir. 2007) (noting that facts are properly rejected as legally insufficient where they "fail[ ] to give notice of the basic events and circumstances on which a plaintiff relies"); *Henry v. NYC Health & Hosp. Corp*., 18 F. Supp. 3d 396, 405–06 (S.D.N.Y. 2014) (finding that the plaintiff's "[v]ague" and "conclusory allegation that she was denied overtime, without more" was insufficient to plead an adverse employment action).

burden rests with Plaintiffs to demonstrate that the allegations as pleaded sufficiently state a basis for liability on the discrimination claim -- and legal authority exists suggesting that the denial of meal or shift breaks may not constitute adverse employment actions -- this Court will not conclude otherwise under these circumstances.  *See Said*, 2010 WL 1265186, at *2; *Francis*, 2018 WL 4292171, at *5 (finding that "a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination" on a motion for default judgment); *Fitchett v. City of New York*, No. 18-CV-8144, 2019 WL 3430726, at *9 (S.D.N.Y. July 30, 2019) ("Similarly, [plaintiff's] allegation that he was denied full meal breaks does not arise to an adverse employment action."); *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 497–98 (S.D.N.Y. 2010) (denials of certain breaks to plaintiff "[did] not amount to adverse employment actions because they do not constitute materially adverse changes in the terms, conditions or privileges of her employment"); *Cardeno v. Potter*, No. 05-CV-4735, 2007 WL 9710708, at *5 (E.D.N.Y. Sept. 19, 2007) ("With respect to the denied lunch, breaks, alarm and computer codes, and keys, Plaintiff fails to establish that such actions affected her work performance or constitute adverse employment actions.").

The only remaining conduct asserted as an adverse employment action is the denial of wages.  *See Alfano,* 294 F.3d 365, 373 (2d Cir.2002) (noting that a materially adverse employment action has an impact on "some tangible job benefits such as compensation, terms, conditions or privileges of employment.").  Significantly, Plaintiffs have not sufficiently alleged their wages were withheld under circumstances which gives rise to an "inference of discriminatory intent."  An inference of discrimination may be discerned from a variety of circumstances, including, "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's "invidious comments about others in the employee's protected

group," or "the more favorable treatment of employees not in the protected group." *Ruiz v. City of New York*, No. 14-CV-5231, 2015 WL 5146629, at *4 (S.D.N.Y. Sept. 2, 2015) (quoting *Dellaporte v. City Univ. of N.Y.,* 998 F.Supp.2d 214, 227 (S.D.N.Y. 2014)).  While stray remarks are generally inadequate to prove discriminatory motivation, verbal comments can establish discriminatory intent when there is a "nexus" between the remarks and a defendant's adverse employment decision. *Francis*, 2018 WL 4292171, at *5 (citing *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 259 (E.D.N.Y. 2005)).  In determining the existence of such a nexus, courts consider the following four factors: (1) who made the remark, *i.e.*, the position the person held; (2) when the remark was made in relation to the adverse employment action; (3) "the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory"; and (4) whether the remark was related to the decision-making process.  *Id*.

Although Plaintiffs allege that Kalogeras made a slew of ethnically and racially degrading and discriminatory remarks to them in the course of their employment, they do not assert that Kalogeras was involved in the decision to withhold their wages.  "[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Soto v. Marist Coll*., No. 17-CV-7976, 2019 WL 2371713, at *4 (S.D.N.Y. June 5, 2019) (citation omitted); *see also Toney v. Prob. Dep't*, No. 15-CV-0561, 2016 WL 859381, at *6 (E.D.N.Y. Jan. 28, 2016), *adopted by* 2016 WL 868206 (E.D.N.Y. Mar. 4, 2016) ("Because by definition, non-decisionmakers play no part in the decision to terminate employment, their biases generally provide no basis for imputing to the decisionmaker an invidious motivation for the discharge."); *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 249

(E.D.N.Y. 2015) (dismissing plaintiff's discrimination claims where plaintiff "fails to allege that any of the named [i]ndividual ... [d]efendants or anyone with control over the decision to fire [the plaintiff] made [the alleged discriminatory] comments").

While Plaintiffs asserted facts here which permit an inference that Defendant *Bivona* was involved in the decision to withhold Plaintiffs' wages, Compl. ¶¶ 46, 54, there are no factual allegations which assert a "nexus" between the derogatory remarks made by Defendant Bivona and the decision to withhold Plaintiffs' wages.  Plaintiffs maintain that Defendant Bivona made discriminatory remarks only to Plaintiff Barrientos, such as calling him "mojados" (wetbacks) and "fucking mojados," and commenting, "you think you're so big but you're just a fucking mojado."  *Id*. ¶ 75.  However, Plaintiffs do not allege any other facts linking those remarks to the decision to withhold wages to an extent that discriminatory intent may be inferred.  *See Toney,* 2016 WL 859381, at *6 ("[A]side from this single conversation wherein an employee made the offensive statement that 'black people live in filth' and an undisclosed description of 'a black guy's house,' [Plaintiff] has failed to allege facts that suggest a causal nexus between that conversation and the termination of her position at the Department of Probation or any other adverse employment action based on her race."); *Sethi v. Narod*, 12 F. Supp. 3d 505, 543 (E.D.N.Y. 2014) ("Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent."); *Jowers v. Family Dollar Stores, Inc.,* No. 09-CV-2620, 2010 WL 3528978, at *3 (S.D.N.Y.  Aug. 16, 2010) *aff'd,* 455 Fed. App'x 100 (2d Cir. 2012) ("Only where decision-makers repeatedly make comments that draw a direct link between a plaintiff's membership in a protected class and adverse employment action can an inference of discriminatory animus be drawn."); *Klings v. N.Y.S. Office of Court Admin.,* No. 04-

CV-3400, 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010) ("[S]upervisors' remarks may be probative of a discriminatory motive when they describe why a decision was made.").

Plaintiffs also allege that they were treated differently from similarly situated non-Latino/a employees.  Compl. ¶¶ 10-12, 34, 32, 73, 114, 121, 133, 154, 174.  An inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group."  *Sethi*, 12 F. Supp. 3d at 544 (quoting *Abdul-Hakeem v. Parkinson,* 523 Fed. App'x 19, 21 (2d Cir. 2013)).  "The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, such that the comparator must be similarly situated to the plaintiff in all material respects."  *Id*. (internal quotations and citation omitted); *see also Jablonski v. Special Counsel, Inc.*, No. 16-CV-5243, 2017 WL 4342120, at *4 (S.D.N.Y. Sept. 28, 2017), *on reconsideration in part*, No. 16-CV-5243, 2018 WL 3979591 (S.D.N.Y. Aug. 20, 2018).  Here, Plaintiffs make a general statement that they were treated differently from non-Latino/a employees.  However, they fail to assert specific allegations identifying any non-Latino/a comparator or particularizing the facts and circumstances of such comparator(s) showing that the comparator(s) was similarly situated to the Plaintiffs in all material respects.  Therefore, Plaintiffs' conclusory allegations regarding the treatment of non-Latino/a employees do not raise an inference of discriminatory intent in these circumstances.  *See Henry*, 18 F. Supp. 3d at 408 ("Without factual amplification, the generic allegation of disparate treatment related to an unspecified class of Caucasian person is simply not sufficient...."); *Rolle v. Educ. Bus Transp., Inc.*, No. 11-CV-3855, 2013 WL 783026, at *12 (E.D.N.Y. Feb. 12, 2013) (holding that although the plaintiff "does make statements regarding the preferential treatment of Caucasian [employees] as compared to African-American [employees], [the] [p]laintiff's broad statements

do not contain the necessary 'factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and lack sufficient detail to render her claim of discrimination plausible").

For the foregoing reasons, because Plaintiffs have not adequately alleged that they suffered an "adverse employment action" under circumstances giving rise to an "inference of discriminatory intent," they have not sufficiently stated a claim for disparate treatment based on race, ethnicity, and national origin in violation of Title VII, NYSHRL, and/or Section 1981.

### C.    Prejudice

The final factor for the Court to consider is whether Plaintiffs would be prejudiced if the motion for default judgment were to be denied.  Denying this motion would be prejudicial to Plaintiffs since "there are no additional steps available to secure relief in this Court." *Bridge Oil Ltd.*, 2008 WL 5560868, at *2 (citing *Mason Tenders*, 2003 WL 1960584, at *3).  "Without the entry of a default judgment, [the p]laintiff would be unable to recover for the claims adequately set forth in the [c]omplaint." *Joseph v. HDMJ Rest., Inc.,* 970 F. Supp. 2d 131, 148 (E.D.N.Y. 2013); *Reliance*, 2013 WL 4039378, at *4.  Here, if a default judgment is not granted, Plaintiffs will have no alternative legal redress against Defendants for the damages sustained.

Accordingly, the Court respectfully recommends that default judgment be:  (1) entered on behalf of Plaintiffs Tenecora, Romero, Flores, Lalvay and Ramos on their sex based discrimination claims against Defendants in violation of Title VII and the NYSHRL (Counts I and V); (2) entered on behalf of Plaintiffs Tenecora, Romero, Ramos, Lalvay, Flores, Ascenio, Barrientos, Morocho, Gonzalez and Varela on the race based hostile work environment claims against Defendants in violation of Title VII and the NYSHRL (Counts II and VI); but be (3)

denied as to Plaintiffs' race based discrimination claims in violation of Title VII, NYSHRL, and/or Section 1981 (Counts III, IV, and VII)

## V.   DAMAGES

Although a party's default is viewed as "a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound*, 973 F.2d at 158. Therefore, once a party's default as to liability is established, a plaintiff still must prove damages. *See Metro Found. Contractors, Inc.*, 669 F. 3d 230, 234 (2d Cir. 2012); *Gutman v. Klein*, No. 03-CV-1570, 2010 WL 4975593, at *1 (E.D.N.Y. Aug. 19, 2010) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."). The Court "may conduct hearings or make referrals ... when, to enter or effectuate judgment, it needs to . . . determine the amount of damages [or] establish the truth of any allegation by evidence." Fed. R. Civ. P. 55(b)(2). However, the Court is not required to hold a hearing if the party seeking damages submits "[d]etailed affidavits and other documentary evidence" in support of its request. *See Chanel, Inc. v. Louis*, No. 06-CV-5924, 2009 WL 4639674, at *4 (E.D.N.Y. Dec. 7, 2009) (citing *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991)). On a motion for default judgment, a plaintiff has the burden of proving damages to the Court with "reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (citation omitted). Therefore, the only question remaining is whether Plaintiffs have provided adequate support for the damages sought. *See Gutman v. Klein*, No. 03-CV-1570, 2010 WL 4975593, at *1 (E.D.N.Y. Aug. 19, 2010), *report and recommendation adopted*, No. 03-CV-1570, 2010 WL 4916722 (E.D.N.Y. Nov. 24, 2010), *aff'd*, 515 Fed. Appx. 8 (2d Cir. 2013) ("The burden is on the plaintiff to establish its entitlement to recovery.").

Plaintiff seeks to recover damages in the amount of $748,599.05, comprised of $483,000 in compensatory damages for emotional distress, $143,000 in punitive damages, $121,071.10 in attorneys' fees, and $1,527.95 in costs.  *See* Pls.' Mem. at 44.  In support of the request for damages, Plaintiffs' counsel submitted, among other things:  (1) a declaration from each plaintiff attesting to the discriminatory and hostile conduct and describing the resulting harm each one suffered [DE 47-5 to 47-14]; (2) two attorney declarations [DE 47-4; DE 47-5]; (3) contemporaneous time and billing records [DE 47-19; DE 47-22; DE 47-23]; and (4) an itemization of costs incurred in connection with the litigation [DE 47-26].  Plaintiffs are seeking "compensatory damages for significant emotional distress and pain and suffering, as well as punitive damages."  Pls.' Mem. at 11.

A.    **Compensatory Damages**

Violations of Title VII and the NYSHRL "entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering."  *Moore v. Houlihan's Restaurant, Inc.*, No. 07-CV-3129, 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011); *see also Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, No. 15-CV-4381, 2017 WL 9482107, at *23 (E.D.N.Y. Feb. 24, 2017*), report and recommendation adopted as modified*, No. 15-CV-4381, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017) ("Courts have awarded damages for emotional distress under Title VII, Section 1981, the NYSHRL and the NYCHRL.").  "Victims of employment discrimination are entitled to reasonable damages that would make the plaintiff 'whole for injuries suffered on account of unlawful employment discrimination.'"  *Id.* (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1988)).  Plaintiffs further point out that Section 1981 also provides for awards of compensatory and punitive damages. Pls.' Mem. at 13.  Counsel notes that "[t]he statute has been interpreted by the Supreme Court to permit compensatory damages

for noneconomic harm, including 'emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses.'" *Id*. (quoting 42 U.S.C. § 1981a(b)(3) and *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975)).  The thrust of these damages claims here are directed to the emotional distress experienced by each of the named Plaintiffs.

"The Second Circuit sorts emotional distress claims into three categories of claims: 'garden-variety,' 'significant' or 'egregious.'" *Cavalotti*, 2018 WL 5456654, at *27 (quoting *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005).  "'Garden variety' emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $5,000 to $35,000 awards." *Munson v. Diamond,* 15-CV-0425, 2017 WL 4863096 at *8 (S.D.N.Y. June 1, 2017) (internal quotation marks omitted) *report and recommendation adopted*, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017); *Antoine v. Brooklyn Maids 26, Inc.,* No. 19-CV-5676, 2020 WL 5752186, at *16 (E.D.N.Y. Sept. 26, 2020) ("For 'garden-variety' emotional distress claims, where plaintiff 'did not seek medical treatment but [ ] the evidence in the form of plaintiff's testimony describes shock, nightmares, sleeplessness, humiliation, and other subjective distress,' courts have awarded damages ranging from $5,000 to $35,000.") (citations omitted); *Perez v. Jasper Trading, Inc*., 05-CV-1725, 2007 WL 4441062 at *9 (E.D.N.Y. Dec. 17, 2007) (emotional distress claims in the employment context where the evidence of emotional distress "consists of plaintiff's own testimony describing the emotional distress, with little or no supporting medical evidence" usually warrant awards of $5,000 to $30,000).

"Significant" emotional distress claims typically involve "substantial harm that is often corroborated by witnesses or is evidenced by medical documents" and "damages for this type of claim range from $50,000 to $100,000." *Francis,* 2018 WL 4292171 at *10.  Finally, "[e]gregious emotional distress claims justifying awards exceeding $100,000 have only been

warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected." *Cavalotti*, 2018 WL 5456654 at *27 (internal quotation marks and citation omitted).

When awarding compensatory damages, courts "have considered the duration, severity, consequences and physical manifestations of the mental anguish, as well as any treatment that plaintiff underwent as a result of her anguish." *Lippe v. Total Nutrition Holdings LLC*, No. 16-CV-167049, 2018 WL 4473548, at *3 (E.D.N.Y. Aug. 28, 2018), *report and recommendation adopted*, No. 16-CV-7049, 2018 WL 4471636 (E.D.N.Y. Sept. 18, 2018) (citing *Gleason v. Callanan Industr., Inc.*, 203 A.D.2d 750, 752, 610 N.Y.S.2d 671, 673 (2d Dep't 1994)). As discussed above, liability has been established for Plaintiffs' sex and/or raced based hostile work environment claims under Title VII the NYSHRL.

An employment discrimination claim must be filed with the EEOC within 300 days of the alleged discrimination. *Humphreys v. New York City Health & Hosps. Corp.*, No. 16-CV-9707, 2018 WL 3849836, at *4 (S.D.N.Y. Aug. 10, 2018) (citing 42 U.S.C. § 2000e–5(e)(1)); *see also Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2020 WL 6274826, at *38 (S.D.N.Y. Oct. 24, 2020) ("[T]he limitations period for filling" a Title VII action "is 300 days after the alleged unlawful practice." ) (citations omitted). The statute of limitations under the NYSHRL is three years. *See Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007)). "Although the Second Circuit has yet to definitively opine on the issue of whether the filing of a charge with the EEOC serves to automatically toll the statute of limitations on claims asserted under the NYSHRL, numerous courts in this Circuit have held that the three-year statute of limitations applicable to claims under the NYSHRL 'is tolled during the period in

which a complaint is filed ... with the EEOC.'" *Id.* (citing *Esposito v. Deutsche Bank AG,* No. 07-CV-6722, 2008 WL 5233590, at *5 (S.D.N.Y. Dec. 16, 2008) (collecting cases, footnote omitted)).  Factoring in this tolling period, Plaintiffs' hostile work environment claims, along with any damages arising from those claims, would be time-barred under Title VII if they arose prior to September 30, 2016, and under the NYSHRL if they arose prior to July 27, 2014.

However, given the applicable caselaw, these claims are covered by the "continuing violation doctrine" which the Court has taken into account when assessing the damages and recommending the awards below.  *See Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 220 (2d Cir. 2004) ("To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period."); *Velez v. New York City Police Pension Fund Article II*, No. 18-CV-1366, 2019 WL 1382884, at *7 (S.D.N.Y. Mar. 27, 2019) ("[T]he [continuing violations] doctrine generally applies to hostile work environment claims, rather than to discrete discriminatory acts.") (citations and quotation marks omitted).  The Court will evaluate the damages requested by Plaintiffs in turn.

### 1.     *Plaintiff Tenecora*

Plaintiff Tenecora seeks $50,000.00 in emotional distress damages.  Pls.' Mem. at 29-30. She was employed by Defendants as a waitress from approximately March 2001 to December 2016.  Compl. ¶ 28.  Plaintiff Tenecora submitted a declaration stating that she suffered from stress, sleeplessness, and nervousness almost every day of her employment due to the hostile and abusive conduct to which she was subjected.  *See* Tenecora Decl. ¶ 8.  She adds that her emotional and mental well-being were negatively impacted and she was frequently angry which consequently strained her relationship with her family.  *Id*. ¶ 9.  Kalogeras' sexual advances

made her feel uncomfortable and she feared being alone with him. *Id*. ¶¶ 11-12.  Further, as a result of being denied meal breaks, Plaintiff Tenecora states that her eating habits changed and she developed gastritis at some undefined point in time. *Id*. ¶¶ 5, 7.

Although Plaintiff Tenecora's allegations of emotional distress are significant, they are stated as conclusions drawn by plaintiff herself and are not corroborated by any other testimony before the Court.  Nor has Tenecora submitted evidence of any medical or mental health treatment -- including any medical documentation that she suffered from and was treated for gastritis -- nor has she provided evidence as to the onset and duration of her emotional distress. Moreover, neither Plaintiff Tenecora -- nor the other Plaintiffs who have attested to similar resulting harm -- have alleged that the physical injuries suffered from the denial of meal breaks are physical manifestations of any mental or emotional anguish experienced or that physical injury itself caused mental or emotional anguish. *Compare Welch v. United Parcel Serv., Inc*., 871 F. Supp. 2d 164, 193 (E.D.N.Y. 2012) (As for the middle of the spectrum "courts have awarded damages for emotional distress in the sum of $100,000 only in cases where the employer's discriminatory conduct has caused plaintiff stress which manifested itself in the form of severe emotional or physical reactions."); *Shea v. Icelandair,* 925 F. Supp. 1014, 1021 (S.D.N.Y. 1996) (awarding emotional distress damages where emotional stress of being demoted and terminated induced the onset of the plaintiff's Parkinson's disease and heart problems as supported by plaintiff's medical expert).  The Court examines and considers the harm asserted here but also points out that Plaintiffs have not included any legal authority showing damages awarded in such circumstances nor any guidance on how such physical injuries should be considered within the framework of the emotional distress damages sought here.

Having carefully considered Plaintiff Tenecora's declaration setting forth the severity and intensity of the sexual harassment and discriminatory conduct as well as the hostile and abusive behavior to which she was subjected, the absence of any corroborating evidence, the lack of evidence of any medical or mental health treatment, and the caselaw from which the Court draws guidance, the Court recommends awarding Plaintiff Tenecora $40,000 in compensatory damages. *See Setty*, 2018 WL 8415414, at *18 (recommending an award of $25,000 where plaintiff stated his relationships were negatively impacted, he felt uncomfortable and humiliated from sexual harassment and suffered from depression, oversleep, and headaches but did not submit any medical or mental health records showing he sought treatment nor any corroborating evidence); *Santiago*, 2017 WL 9482107, at *23 (finding that plaintiff's statement that he experienced "anxiety, stress, shame and embarrassment, and loss of self worth," was sufficient to support an award for emotional distress damages in the amount of $30,000 even though plaintiff did not seek treatment from any medical provider); *Rodriguez,* 2014 WL 1347369 at *7 ($10,000.00 in emotional distress damages where plaintiff testified to suffering "severe emotional distress and physical ailments" as a result of her supervisor making sexually derogatory remarks to her and stroking her hair and shoulder, but did not submit any medical records); *Drice v. My Merchant Servs., LLC,* No. 15-CV-0395, 2016 WL 1266866, at *4 (Mar. 4, 2016), *report and recommendation adopted,* 2016 WL 1266948 (E.D.N.Y. Mar. 31, 2016) (recommending and later adopting award of $20,000 in emotional distress damages where plaintiff credibly testified that she suffered from, among other things, severe anxiety and depression, feelings of worthlessness, and an emotional distress that affected her ability to eat and sleep, but the duration of her employment was brief and she did not submit any evidence of seeking professional help or having prolonged, severe symptoms).

48

## 2.    *Plaintiff Romero*

Plaintiff Romero seeks $40,000.00 in emotional distress damages.  Pls.' Mem. at 29-30.

She was employed by Defendants as a busser from approximately May 2014 to December 2016.

Compl. ¶ 49.  Plaintiff Romero submitted a declaration stating that she felt stressed, humiliated,

intimidated, uncomfortable, demoralized, and suffered a loss of self-esteem from the hostile and

abusive behavior to which she was subjected.  Romero Decl. ¶¶ 2-4, 8, 10, 15.  She states that

she was always nervous before and during work in anticipation of the abusive treatment she

knew awaited her.  *Id*. ¶ 15.  Romero suffered headaches, migraines, and physical pain in her

shoulders and neck from the stress she experienced.  *Id*. ¶ 10.  Although Plaintiff Romero's

allegations of emotional distress are significant, they are stated as conclusions drawn by Plaintiff

herself, similar to Plaintiff Tenecora, and are not corroborated by any other testimony before the

Court.  No evidence has been presented regarding the duration of the emotional distress, nor that

Romero sought medical or mental health treatment for that distress.  Taking into account the

contents of Romero's Declaration, the physical manifestations of her harm, the severity and

intensity of the sexually hostile and abusive behavior to which she was subjected, the absence of

any corroborating evidence, lack of medical treatment, and the caselaw addressing similar

circumstances, the Court recommends awarding Plaintiff Romero $30,000 in compensatory

damages.[7]  *See Setty*, 2018 WL 8415414, at *18; *Joseph*, 970 F. Supp. 2d at 153-54 (awarding

plaintiff $30,000 in emotional distress damages where plaintiff's allegations of emotional distress

---

[7]      The Court notes that Plaintiff Romero also states that that she suffered from gastritis "at times," periodic dizziness, weight loss, and hair loss more than she usually experienced, as a result of being denied meal breaks.  Romero Decl. ¶ 12.  However, the denial of meal breaks was experienced by all Plaintiffs regardless of sex and does not form the basis of Romero's sex based hostile work environment claim.  Since this is the only claim for which liability is established for Plaintiff Romero, damages are limited to the injuries related to this claim.

were "significant but [were] stated as conclusions drawn by the Plaintiff herself[ ] [w]ithout any medical documentation[.]"); *Drice,* WL 1266866, at *4.

### 3.    *Plaintiff Flores*

Plaintiff Flores seeks $90,000.00 in emotional distress damages.  Pls.' Mem. at 30. Flores was employed by Defendants as a waitress from approximately 2000 to December 2016.  Compl. ¶ 79.  In her declaration, Flores states that she felt stressed, angry, helpless, offended, belittled, depleted, and experienced a loss of self-esteem from the hostile and abusive behavior to which she was subjected.  Flores Decl. ¶¶ 3-4, 6-8, 10, 19.  As a result of the stress, Flores states that she experienced severe headaches and back pains, which often prevented her from sleeping, and irregular menstruation cycles, which affected her emotional state.  *Id*. ¶¶ 11, 14.  Plaintiff Flores states that she sought medical treatment *in 2006* for these symptoms and was proscribed a hormone treatment and other unidentified "medicine."  *Id*.  She was required to return to the doctor again several months later because of continued pain, after which she was referred to a chiropractor.  *Id*. ¶ 12.  Although Flores states that she was able to regulate her menstrual cycle with the hormone treatments, she continued to periodically suffer headaches and back pains in varying severity throughout the remainder of her employment.  *Id*.  ¶¶ 11-14.  In August 2016, Plaintiff Flores states that she started crying all the time and experienced drastic hormonal swings, along with the similar headaches and back pain she previously experienced.  *Id*. ¶ 17.  She sought medical attention and was diagnosed with depression and hormonal imbalance.  *Id*.  Based on the restrictions placed on her breaks, Flores states that suffered a change in eating habits and weight gain.  *Id.* ¶ 12.

Although Plaintiff Flores attests to seeking medical attention, she has not introduced testimony from a medical professional or submitted any records or evidence of her medical or

mental health treatment.  Moreover, there is no evidence of the duration of Plaintiff Flores's emotional distress.  The Court declines to award damages for the 2006 symptoms and medical treatment Plaintiff Flores states she underwent because the time frame is far removed from the statutory limitations period and is too attenuated even under a continuing violation theory. Likewise, Plaintiff has drawn no direct correlation to the workplace events in 2006.  The assertions made by Flores in this regard are too speculative, especially where Plaintiff has the burden of *proving* her damages here.

Based on Plaintiff Flores' testimony, the physical manifestations of her harm, the severity and intensity of the sexually hostile and abusive behavior she was subjected to, the absence of any corroborating evidence, lack of proof of her medical diagnosis or treatment, and the applicable caselaw, the Court recommends awarding Plaintiff Flores $40,000 in compensatory damages.  *See Joseph*, 970 F. Supp. 2d at 153–54; *compare Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08-CV-10283, 2009 WL 2611950, at *6 (S.D.N.Y. Aug. 18, 2009), *report and recommendation adopted sub nom. Becerril* v. *Ease Bronx NAACP Child Develpoment Ctr.*, No. 08-CV-10283, 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009) (awarding $50,000 for emotional distress that was "significant" because documentation from a physician was submitted that plaintiff was prescribed three medications, diagnosed with depression, and suffered migraines and post-concussive syndrome).

### 4.    *Plaintiff Barrientos*

Plaintiff Barrientos seeks $100,000.00 in emotional damages.  Pls.' Mem. at 31.  He was employed as a dishwasher, food preparer, assistant chef, and line cook by Defendants from approximately 1999 to December 2016.  Compl. ¶ 67.  Plaintiff Barrientos submitted a declaration attesting that he suffered physical and mental harm from the hostile and abusive

environment to which he was subjected.  Barrientos Decl. ¶¶ 1, 4.  He states that he felt stressed, intimidated, humiliated, degraded, angry, and experienced reduced self-esteem.  *Id*. ¶¶ 6, 7, 8, 14-15.  At one point, he was denied sufficient sick leave when he had chicken pox and was forced to work while he was still exhibiting symptoms.  *Id*. ¶ 7.  As a result, Plaintiff Barrientos states that his total recovery time was ultimately extended from 21 days to two months because he was forced to go back to work before recovering.  *Id*.  Plaintiff Barrientos states that he became more reclusive from the stress he suffered and that he continues to experience the psychological effects of the abuse in that his body tenses and heart races when his current employer approaches him.  *Id*. ¶¶ 14, 16, 18.  Also, as a result of being denied meal breaks, Plaintiff Barrientos states that he suffered anemia, dizziness, weakness, and hand tremors.  *Id*. ¶ 12.  He says that he sought medical treatment for these conditions and incurred associated costs.[8]  *Id*.  Barrientos does not assert that these injuries were physical manifestations of emotional anguish or that they caused emotional anguish.  Moreover, the remainder of the harm stated generally falls within the garden variety category of damages.  *See Caravantes v. 53rd St. Partners, LLC,* No. 09-CV-7821, 2012 WL 3631276, at *22 (S.D.N.Y.2012) ("garden variety" emotional distress claims may merit an award of $30,000).

Based on Plaintiff Barrientos' testimony, the severity and intensity of the hostile and abusive behavior he was subjected to, and for all the same considerations and applicable law discussed above in awarding emotional distress damages, the Court recommends awarding

---

[8]    Plaintiff Barrientos complains of having suffered additional physical pain. However, the symptoms were not caused by any specific hostile and abusive conduct alleged in the Complaint (*i.e.*, working conditions in the kitchen, denial of water, *etc.*).  Barrientos Decl. ¶¶ 11, 13.  Since Plaintiffs have not cited any legal authority in support of the proposition that a court may award damages for allegations that do not form the basis of liability on a motion for default judgment, this Court will not consider his statement regarding the additional injuries suffered.

Plaintiff Barrientos $35,000 in compensatory damages.  *See Joseph*, 970 F. Supp. 2d at 153–54;; *Becerril*, 2009 WL 2611950, at *6.

###         5.         *Plaintiff Varela*

Plaintiff Varela seeks $8,000.00 in emotional damages.  Pls.' Mem. at 31.  He was employed by Defendants as a dishwasher from October 2016 to December 2016.  *Id*. ¶ 128.  Varela submitted a declaration attesting that he felt stressed, demeaned, demoralizing, humiliated, and depressed from the hostile and abusive environment he was subjected to.  Varela Decl. ¶¶ 1, 5, 11-12.  Whenever he had to go to work, Varela states he felt nervous and dreaded going.  *Id*. ¶ 13.  As a result of being denied meal breaks, he states he felt physically weak and dizzy.  *Id*. ¶ 9.  Unlike the majority of the Plaintiffs who were employed for significantly longer periods of time, however, Plaintiff Varela worked at Ba-Kal Restaurant for no more than *two months*.  Compl. ¶ 128.  Based on Plaintiff Varela testimony's of harm which falls with the garden variety damages category, the level of severity and intensity of the hostile and abusive behavior he was subjected to, the complete absence of any corroborating evidence, lack of testimony or evidence he sought medical or mental health treatment, the brief period of his employment, and the applicable caselaw, the Court recommends awarding Plaintiff Varela $4,000 in compensatory damages.  *See Cartagena v. Providence Const. Corp.,* No. 14-CV-7357, 2017 WL 9286986, at *4 (May 1, 2017), *report and recommendations adopted*, 2018 WL 2088004 (E.D.N.Y. May 3, 2018) (recommending and later adopting award of $5,000 in emotional damages where the plaintiff testified that he felt significant emotional distress and anger, but did not seek psychological or medical treatment); *Miller-Rivera v. Eddie Jr.'s Sports Lounge, Inc*., No. 17-CV-0603, 2018 WL 3581735, at *4 (Jan. 2, 2018), *report and recommendation adopted*, 2018 WL 3581698 (E.D.N.Y. July 25, 2018) (recommending and later

adopted award of $5,000 where "plaintiff was terminated only about a week after she was hired[,] ... did not seek treatment for her emotional distress, and offered no evidence to corroborate her claims of anxiety, humiliation or hurt feelings").

### 6.    *Plaintiff Ramos*

Plaintiff Ramos seeks $20,000.00 in emotional damages.  Pls.' Mem. at 33.  She was employed by Defendants as a waitress from approximately September 2016 to December 2016.  Compl. ¶ 117.  Plaintiff Ramos submitted a declaration attesting that she suffered significant stress and constant nervousness from the hostile and abusive environment to which she was subjected.  Ramos Decl. ¶¶ 7, 8.  Shortly after beginning her employment with Defendants, Plaintiff Ramos states that she noticed her breast milk lost its consistency and quality.  *Id*. ¶ 9.  Also, as a result of being denied meal breaks, she states that she suffered stomach pains, hand tremors, dizziness, and exhaustion.  *Id*. ¶ 7.  Unlike the majority of the Plaintiffs who were employed for significantly longer periods of time, however, Plaintiff Ramos worked at Ba-Kal Restaurant for *three months*.  Compl. ¶ 117.   Moreover, the Court has concerns with Ramos apparently claiming a causal link between her work environment and the changes in her breast milk without any medical documentation.  Based on Plaintiff Ramos description of harm, the severity and intensity of the hostile and abusive behavior she was subjected to, and for all the same considerations discussed above in awarding Plaintiff Varela's emotional distress damages, the Court recommends awarding Plaintiff Ramos $8,000 in compensatory damages.  *See Cavalotti,* 2018 WL 5456654, at *28 (recommending $10,000 for emotional distress damages where plaintiff submitted an affidavit attesting to her feelings of humiliation and distress but "did not attest to, or submit evidence of, seeking medical or mental health treatment; did not provide details of her experience of distress; and [whose] employment was relatively brief"); *Rodriquez,*

2014 WL 1347369, at *7 (recommending $10,000 for emotional distress damages even though plaintiff's allegations of emotional distress were "significant" because the allegations were stated as conclusions drawn by plaintiff herself, the allegations did not address the duration of her emotional distress, and the duration of plaintiff's employment was brief).

### 7. *Plaintiff Morocho*

Plaintiff Morocho seeks $50,000.00 in emotional distress damages. Pls.' Mem. at 32. He was employed by Defendants as a dishwasher and food preparer from approximately 2002 to December 2016. Compl. ¶ 106. Plaintiff Morocho submitted a declaration attesting that he constantly suffered anxiety and fear and, at times, felt inferior and humiliated from the hostile and abusive behavior to which he was subjected. Morocho Decl. ¶¶ 7-9, 11, 14. On the occasion that Kalogeras grabbed his collar and yelled in his face, Plaintiff Morocho states that he felt intimidated and terrified. *Id*. ¶ 10. As a result of being denied meal breaks, Morocho states that he suffered stomach pains and exhaustion. *Id* ¶ 6. For similar considerations already discussed, and based on Plaintiff Morocho's testimony of harm, the severity and intensity of the hostile and abusive behavior he was subjected to, the absence of any corroborating evidence, lack of proof that he sought medical or mental health treatment, lack of testimony as to the duration of his harm, the Court recommends awarding Plaintiff Morocho $25,000 in compensatory damages. *See Munson*, 2017 WL 4863096, at *8 (recommending and later adopting award of $20,000 for emotional distress damages where plaintiff submitted an affidavit in which she attested to, among other things, feeling "intimidated, abused, anxious, and physically ill" as a result of the defendant's conduct, but "fail[ed] to provide any medical records, any corroborating evidence, or any evidence of 'extraordinary circumstances,' as that term is used in Title VII cases") (alterations omitted); *Francis* 2018 WL 4292171, at *11 (recommending award of $ 15,000 to

African-American plaintiffs who were called racially offensive names and terminated based on their race, who testified that they felt "different," "bad," "degraded," "fearful," and "constantly stressed and anxious"); *Manson v. Friedberg,* No. 08-CV-3890, 2013 WL 2896971, at *6 (S.D.N.Y. June 13, 2013) (awarding $10,000 in emotional distress damages based on the plaintiff's vague and conclusory testimony that she "had low self-esteem, felt 'unworthy' and 'was having a difficult time feeling trust'").

### 8. *Plaintiff Lalvay*

Plaintiff Lalvay seeks $20,000.00 in emotional distress damages.  Pls.' Mem. at 31.  She was employed by Defendants as a busser from approximately September 2010 to October 2016. *Id*. Compl. ¶ 96.  Plaintiff Lalvay submitted a declaration attesting that she felt intimidated on a number of occasions, felt bad about herself, demoralized, belittled, and humiliated from the hostile and abusive behavior to which she was subjected.  Lalvay Decl. ¶¶ 1, 3-7.  She states that on two occasions she was brought to tears, felt nervous and afraid to go into work every day, and would shut down emotionally whenever Kalogeras was nearby.  *Id*. ¶¶ 6, 7.  Based on Plaintiff Lalvay's testimony of harm, the severity and intensity of the hostile and abusive behavior to which she was subjected, and for all the same considerations and applicable law discussed above, the Court recommends awarding Plaintiff Lalvay $12,000 in compensatory damages*.  See Manson,* 2013 WL 2896971, at *6; *Gonsalez v. Marin,* No. 12-CV-1157, 2014 WL 2514704, at *11 (Apr. 25, 2014), *report and recommendation adopted,* 2014 WL 2526918 (E.D.N.Y. June 4, 2014) (recommending and later adopting award of $10,000 for emotional distress damages where the plaintiff's allegations of emotional distress were serious, but were stated as conclusions drawn by the plaintiff herself, unsupported by corroborating medical testimony, and "failed to address the severity, duration, or consequences of her emotional distress").

### 9.    *Plaintiff Ascenio*

Plaintiff Ascenio seeks $20,000.00 for in emotional damages.  Pls.' Mem. at 33.  She was employed by Defendants as a dishwasher from approximately March 2015 to December 2016.  Compl. ¶ 59.  Plaintiff Ascenio submitted a declaration attesting that she suffered depression, stress, and anxiety from the hostile and abusive environment to which she was subjected.  Ascenio Decl. ¶ 8.  She states that she was emotionally distraught and cried almost every day.  *Id*. ¶ 7.  At some undefined point in time, she states that she started losing her hair at an accelerated rate and experienced irregular menstrual cycles.  *Id*. ¶¶ 5-6.  Plaintiff Ascenio states that she sought medical treatment and was advised that the irregularity in her menstrual cycle was a result of her working conditions.  *Id*. ¶ 6.  While Ascenio may have been told that, however, she has not produced any records or documentation supporting the medical condition or causation.  As a result of being denied meal breaks, Ascenio states that she suffered headaches, stomach pains, weakness, and dizziness.  *Id*. ¶ 5.  Based on Plaintiff Ascenio's testimony of harm, the severity and intensity of the hostile and abusive behavior she was subjected to, and for all the same considerations and applicable law discussed above in awarding emotional distress damages, the Court recommends awarding Plaintiff Ascenio $12,000 in compensatory damages.

### 10.    *Plaintiff Gonzalez*

Plaintiff Gonzalez seeks $70,000.00 for in emotional damages.  Pls.' Mem. at 28-29.  She was employed by Defendants as a waitress from approximately 2010 to December 2016.  Compl. ¶ 88.  Plaintiff Gonzalez submitted a declaration attesting that she suffered from gastritis, anemia, headaches, and dizzy spells as a result of being denied meal breaks.  Gonzalez Decl. ¶ 7.  She states that she felt depressed, demoralized, tense, and embittered as a result of the hostile and

abusive environment to which she was subjected. *Id.* ¶¶ 9, 13.  She also states that she

increasingly lost hair from the stress she experienced. *Id.* ¶ 9.  Because of the trauma she claims

to have experienced, Plaintiff Gonzalez states that she could not work for five (5) months after

leaving her employment in December 2016. *Id.* ¶ 14.  However, during that time she states that

her physical and emotional symptoms subsided and eventually went away. *Id.* ¶ 14.  The Court

notes that Gonzalez is not eligible for damages for the time after leaving employment,

particularly since she has produced no corroborating evidence and no medical records or

testimony.

Based on Plaintiff Gonzalez's testimony of harm, the severity and intensity of the hostile

and abusive behavior she was subjected to, and for all the same considerations and applicable

law discussed above in awarding emotional distress damages, the Court recommends awarding

Plaintiff Gonzalez $20,000 in compensatory damages. *See* Munson, 2017 WL 4863096, at *8

(recommending and later adopting award of $15,000 for emotional distress damages where

plaintiff submitted an affidavit in which she attested to, inter alia, feeling "intimidated, abused,

anxious, and physically ill" as a result of the defendant's conduct, but "fail[ed] to provide any

medical records, any corroborating evidence" (alterations omitted)).

Accordingly, the Court respectfully recommends to Judge Hurley that Plaintiffs be

awarded a total of $226,000.00 in compensatory damages.

## B.    Punitive Damages

Plaintiffs seek a total of $143,000 in punitive damages.  *See* Pls.' Mem. at 44.  "Punitive

damages are a discretionary moral judgment that the defendant has engaged in conduct that is so

reprehensible that it warrants punishment." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d

Cir. 2015) (citation and internal quotation marks omitted).  Although the NYSHRL does not

provide for punitive damages, *see Fairias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001), such damages are available under Title VII and Section 1981.[9]  *See* 42 U.S.C. § 1981a(b)(1) (authorizing punitive damages under Title VII, except against "a government, government agency or political subdivision"); *Norris v. New York City Coll. of Tech.*, 07-CV-853, 2009 WL 82556, at *5 (E.D.N.Y.  Jan. 14, 2009) (authorizing punitive damages under Title VII, except against "a government, government agency or political subdivision"); *Luciano v. Olsten Corp.*, 110 F. 3d 210, 220-21 (2d Cir 1997).  Moreover, punitive damages are available in a default setting.  *See Antoine v. Brooklyn Maids 26, Inc.*, 19-CV-5676, 2020 WL 5752186, at *20 (E.D.N.Y. Sept. 26, 2020); *Francis v. City of New York*, 15-CV-7997, 2019 WL 8918743, at *10 (S.D.N.Y. Nov. 12, 2019).

The showing required for an award of punitive damages is not the same as that required for liability.  *Wiercinski*, 787 F.3d at 115.  Under Title VII, a plaintiff may recover punitive damages if she demonstrates that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C.  § 1981a(b)(1); *see also Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (punitive damages are appropriate only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of

---

[9]     Title VII sets a cap on the aggregate amount of compensatory and punitive damages (excluding back pay) awarded to a plaintiff.  *Munson*, 2017 WL 4863096, at *9, n.10. The Title VII damages cap applicable to employers with 15 to 100 employees is $50,000.  42 U.S.C. § 1981a(b)(3).  Plaintiffs have failed to submit evidence that Defendants employed more than 100 employees for the relevant times.  Further, under Section 1981, "in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000" is the cap for compensatory and punitive damages.  42 U.S.C. § 1981a; *Luciano,* 110 F. 3d at 220-21 (2d Cir 1997).  Therefore, the $50,000 cap applies to Plaintiffs' request for damages.

others" ) (quotation marks omitted).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535.  The employer's state of mind may be "inferred from the circumstances," *Manzo v. Sovereign Motor Cars, Ltd.*, 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010), *aff'd*, 419 Fed. App'x 102 (2d Cir. 2011), and "egregious or outrageous acts may serve as evidence supporting an inference" of the employer's motive or intent.  *Kolstad*, 527 U.S. at 538; s*ee also* Manswell, 2017 WL 9487194, at *19 ("A plaintiff seeking punitive damages under Title VII must present evidence that "(1) the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, *or* (2) that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn.") (citation omitted).

The Supreme Court has delineated several factors for courts to consider in assessing the reasonableness of punitive damages, including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases." *Antoine v. Brooklyn Maids 26, Inc.*, 2020 WL 5752186, at *20 (citing *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09-CV-5378, 2011 WL 4549412, at *5 (S.D.N.Y. Sept. 27, 2011); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).  However, "[a]wards of punitive damages are by nature speculative, arbitrary approximations.  No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013).  Thus, the court's ultimate

responsibility is to ensure that awards for punitive damages are "fair, reasonable, predictable, and proportionate." *Id*.

The court is also required to consider the defendant's financial circumstances in determining an award of punitive damages, no matter how egregious the underlying conduct. *Id*. (citing *Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006)). Moreover, where, as here, liability for punitive damages is sought to be imposed upon an employer for the malicious or recklessly indifferent discrimination of its agents, a plaintiff must demonstrate that the "employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of his employment,'" unless the agent's "discriminatory employment decisions ... [were] contrary to the employer's good-faith efforts to comply with Title VII." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 384–85 (2d Cir. 2001) (quoting *Kolstad*, 527 U.S. at 545).

Plaintiffs argue that that Defendants knew they were acting in violation of federal law because whenever Plaintiffs would protest their treatment and workplace conditions, Defendants would rebuke them and threaten to call immigration authorities. Pls.' Mem. at 21. Initially, Plaintiffs have not cited any legal authority recognizing such circumstances as evidence of "malice" or "reckless indifference" warranting punitive damages. *See Gutman* 2010 WL 4975593, at *1 ("The burden is on the plaintiff to establish its entitlement to recovery."). Second, having reviewed the Plaintiffs' declarations and the Complaint, the Court has identified only three Plaintiffs who allege they were threatened with being referred to immigration authorities in response to complaining about workplace conditions -- Lalvay, Barrientos, and Morocho. *See* Compl. ¶¶ 72, 75, 77, 104; Morocho Decl. ¶ 8. These threats were made by Kalogeras, the individual who committed almost all the conduct which forms the basis of this

action, with a few exceptions.  However, in light of the entire record, the Court is unable to infer Kalogeras' state of mind from these few incidents.

The Complaint alleges that Kalogeras frequently referred to immigration authorities as part of the purported discriminatory and hostile behavior toward Plaintiffs.  Compl. ¶¶ 6, 39, 144, 157, 168; *see also Becerril*, 2009 WL 2972992, at *3 (finding that defendant's behavior "is evidence of intentional discrimination; but that behavior is not evidence that the [defendant] intentionally acted in violation of federal law"); *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 236 (2d Cir. 2000) (holding that an employer who terminated plaintiff after plaintiff had a heart attack "supports a finding of discrimination, [but] does not support a finding that [the defendant] discriminated 'in the face of a perceived risk that its actions [would] violate federal law'") (quoting *Kolstad*, 527 U.S. at 536).  Plaintiff Garcia alleges Kalogeras told her that she and others would likely be "swept up" in an immigration raid.  Compl. ¶ 64.  Plaintiff Lalvay alleges that "whenever a police officer was nearby or would enter the restaurant, [] Kalogeras would lie and tell [her] that it was an immigration officer who came to arrest [her]."  Lalvay Decl. ¶ 3.  Neither Lalvay nor Garcia contend that these comments were in response to any complaint that they made.  Moreover, both Romero and Lalvay allege that Kalogeras told them that they had no rights because they were immigrants -- a statement Kalogeras may have believed.  *See* Romero Decl. ¶ 8; Lalvay Decl. ¶ 3.  Based on these allegations, it is unclear whether Kalogeras knew he may be acting in violation of federal law, and the Court cannot infer the requisite motive or intent.  *See Manzo,* 2010 WL 1930237, at *2.

Alternatively, egregious or outrageous acts may serve as evidence supporting an inference of the employer's motive or intent.  *See Kolstad*, 527 U.S. at 538.  The Court finds that Kalogeras' conduct toward Plaintiffs Tenecora, Ramos and Morocho was egregious enough or

sufficiently outrageous to warrant punitive damages based on comparable caselaw.  Generally, punitive damages are awarded for sex or race based Title VII claims when a plaintiff is subject to inappropriate touching, physical violence, or threat of physical violence.  *See Garcia v. Comprehensive Ctr., LLC*, No. 17-CV-8970, 2019 WL 8274296, at *9 (S.D.N.Y. Nov. 21, 2019), *report and recommendation adopted*, No. 17-CV-8970, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020) (awarding $75,000 in punitive damages to plaintiff whose supervisor called her abusive names, "slammed" her laptop closed on her fingers, "closed-fist-punched" her in the face, threatened her with physical violence, called her racially derogatory names, and grabbed her by her shirt collar and dragged her into his office); *Munson*, 2017 WL 4863096, at *3 (awarding $30,000 in punitive damages to plaintiff where supervisor repeatedly grabbed her buttocks, sexually propositioned her, and made sexually explicit comments); *Styka v. My Merchants Servs. LLC*, No. 14-CV-6198, 2016 WL 3866550, at *4 (E.D.N.Y. July 13, 2016) (awarding $50,000 in punitive damages where supervisor made "crude verbal comments" and "physically forced himself on the plaintiff by kissing her or grabbing her breasts, thighs, or buttocks" for approximately five months); *Offei v. Omar*, No. 11-CV-4283, 2012 WL 2086294, at *1-4, *8 (S.D.N.Y. May 18, 2012), *report and recommendation adopted*, No. 11-CV-4283, 2012 WL 2086356 (S.D.N.Y. June 8, 2012) (awarding $100,000 in punitive damages where defendant sexually assaulted plaintiff leading to panic attacks, hospital treatment, and a need for anti-anxiety medication); *DeCurtis*, 2011 WL 4549412, at *1, *6 (awarding $75,000 in punitive damages in punitive damages to plaintiff whose supervisor groped her, made sexually explicit comments, sent inappropriate emails, and regularly called her late at night and on weekends to talk about sex); *Patterson v. Balsamico,* 440 F.3d 104, 121 (2d Cir.2006) (awarding $10,000 in punitive damages where defendant had physically assaulted plaintiff, sprayed him with mace,

and threatened him with racial slurs). No such allegations have been made here, with the exception of Plaintiff Morocho. Kalogeras repeatedly called Morocho derogatory and demeaning names, yelled at him, and on one occasion grabbed the collar of his shirt and screamed in his face. In addition, although Plaintiff Tenecora does not allege any inappropriate touching, Defendant Bivona and/or Kalogeras repeatedly propositioned her for sex, made sexually explicit comments to her, sent her inappropriate text messages, and contacted her outside of work with invitations to Defendant Bivona's home. *See Manswell*, 2017 WL 9487194, at *1-4, *19 (E.D.N.Y. Aug. 23, 2017) (awarding $100,000 in punitive damages where harasser repeatedly and aggressively propositioned plaintiff for sex and made crude comments over an 18-month period, after which plaintiff was retaliated against). Under these circumstances, an award of punitive damages is arguably appropriate. Nonetheless, the Court must keep in mind that the individual who committed the lion's share of the most egregious acts -- Kalogeras -- is not before the Court. *See Munson*, 2017 WL 4863096, at *8-9 (awarding reduced punitive damages in part because none of the most culpable individuals was "before the Court"); *see also Seiden v. Baker Tilly Hong Kong Ltd.*, No. 17-CV-02583, 2020 WL 6264851, at *6 (S.D.N.Y. Apr. 28, 2020); *Taxi Club Mgmt.*, 2018 WL 3432786, at *11. The Court again points out that punitive damages are not available under the NYSHRL. Title VII does permit an award of punitive damages against the employer but not against an individual employee. *Norris*, 2009 WL 82556, at *5. However, the individual employee/supervisor's (Bivona) conduct can be imputed to the employer as is appropriate here.

Further, because Kalogeras was a managerial agent of Defendant Ba-Kal Restaurant, and because Ba-Kal Restaurant cannot show that it made "good-faith efforts to prevent discrimination in the workplace," Kalogeras' acts may be imputed to Defendant Ba-Kal

Restaurant for the purpose of awarding punitive damages. *Kolstad*, 527 U.S. at 546; *see also Munson*, 2017 WL 4863096, at *9; *Garcia*, 2019 WL 8274296, at *9. Finally, the Court notes that, by defaulting, Defendants have surrendered the opportunity to demonstrate that their financial circumstances should constrain the amount of any such award. *See Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir. 1997) ("Under well established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.'") (citation omitted).

With these principles in mind, the Court respectfully recommends to Judge Hurley that Plaintiff Morocho be awarded $5,000, Plaintiff Ramos be awarded $10,000 and Plaintiff Tenecora be awarded $10,000 in punitive damages.[10]

## C.    Attorneys' Fees

Plaintiffs seek attorneys' fees in the amount of $121,071.10. Pl.'s Mem. at 44. A plaintiff prevailing in a Title VII suit is entitled to recover reasonable attorney's fees and costs. *See* 42 U.S.C. § 2000e–5(k). Both the Second Circuit and the Supreme Court have held that "the lodestar method—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Millea v. Metro-North R.R. Co.,* 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany,* 522 F.3d 182, 183 (2d Cir. 2007)). The Court should

---

[10]    To the extent that the punitive and compensatory damage awards exceeds Title VII's $50,000 cap, the Court allocates the excess compensatory damages to Plaintiff Morocho, Ramos and Tenecora's NYSHRL claims. *See Caravantes*, 2012 WL 3631276, at *21 ("[W]here Title VII claims are pled alongside NYSHRL and NYCHRL claims, courts have awarded damages in excess of the Title VII statutory cap by allocating the excess award to the state and city law claims.") (citations omitted); *Manswell*, 2017 WL 4075180, at *2 n.3 (E.D.N.Y. Sept. 14, 2017) (citations omitted).

determine the "presumptively reasonable fee" by looking to "what a reasonable, paying client would be willing to pay." *Arbor Hill,* 522 F.3d at 183–84.  The party seeking fees bears the burden of establishing that the number of hours for which it seeks compensation is reasonable. *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994) (citing *Hensley*, 461 U.S. at 437); *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F Supp. 3d 19, 51 (E.D.N.Y.  2015); *Dacas v. Duhaney*, 17-CV-3568, 2020 WL 4587343, at *2 (E.D.N.Y. June 18, 2020).  A request for attorney's fees must be "supported by contemporaneous time records that show, 'for each attorney, the date, the hours expended, and the nature of the work done.'"  *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Engineers, Local 15, 15A, 15C & 15D, AFL-CIO by Callahan v. Carlo Lizza & Sons Paving, Inc*., No. 19-CV-2461, 2019 WL 5694053, at *6 (E.D.N.Y. Aug. 22, 2019) (citation omitted).

To determine reasonable hourly rates, the Court considers this Circuit's adherence to the forum rule, which states that a district court should generally use the prevailing hourly rates in the district where it sits.  *See, e.g., Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 175-76 (2d Cir. 2009); *Polk v. N.Y. State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir. 1983); *Joseph v. HDMJ Restaurant, Inc*., No. 09-CV-240, 2013 WL 4811225, at *19 (E.D.N.Y. Sept. 9, 2013); *Pinzon*, 2012 WL 4174725, at *5.  Prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour.  *See LG Capital Funding, LLC v. 5Barz Int'l, Inc.,* No. 16-CV-2752, 2019 WL 3082478, at *2 (E.D.N.Y. July 15, 2019)*; Am. Fire & Cas. Co. v. Scott Elec. Servs., LLC*, No. 15-CV-3111, 2017 WL 395207, at *2 (E.D.N.Y. Jan. 9, 2017), *report and recommendation adopted*, 2017 WL 374728 (E.D.N.Y. Jan. 25, 2017); *Incredible Foods Grp., LLC v. Unifoods, S.A. De C.V.*, No. 14-CV-5207, 2016

WL 4179943, at *3 (E.D.N.Y. Aug. 5, 2016); *Valdez v. H & S Rest. Operations, Inc.*, No. 14-CV-4701, 2016 WL 3079028, at *8 (E.D.N.Y. Mar. 29, 2016), *report and recommendation adopted*, 2016 WL 3087053 (E.D.N.Y. May 27, 2016).  Some courts in this District have awarded a higher range of $300 to $450 per hour for partners "in large law firms and for attorneys with extensive experience with the particular issues of a case." *Johnson v. City of New York*, No. 11-CV-6176, 2016 WL 590457, at *5 (E.D.N.Y. Feb. 11, 2016) (citation omitted); *see also Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. D & A Bus Co., Inc.*, 270 F. Supp. 3d 593, 618 (E.D.N.Y. 2017) (finding that "prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 an hour ... and some courts "have recognized slightly higher ranges in this district of $300–$450 per hour for partners[.]") (collecting cases); *Feltzin v. Ciampa Whitepoint LLC*, No. 15-CV-2279, 2017 WL 570761, at *2 (E.D.N.Y. Feb. 13, 2017); *Volpe v. Nassau Cty.*, No. 12-CV-2416, 2016 WL 6238525, at *6 (E.D.N.Y. Oct. 24, 2016).

After the reasonable hourly rate is determined, the Court multiplies that rate by the reasonable number of hours the attorney expended to determine a presumptively reasonable fee. *See Arbor Hill,* 522 F.3d at 183–84.  To determine whether the number of hours spent by counsel was reasonable, the Court must "use [its] experience with the case, as well as [its] experience with the practice of law, to assess the reasonableness of the hours spent . . . in a given case." *Fox Indus., Inc. v. Gurovich*, No. 03-CV-5166, 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992)).  A court should "exclude hours that were 'excessive, redundant, or otherwise unnecessary' to the litigation." *Cho v. Koam Medical Servs. P.C.*, 524 F. Supp. 2d 202, 209 (E.D.N.Y. 2007) (quoting *Hensley v. Eckerhart*,

461 U.S. 424, 434 (1983)); *Barbu v. Life Ins. Co. of N. Am.*, No. 12-CV-1629, 2015 WL 778325, at *4 (E.D.N.Y. Feb. 24, 2015).

In the instant action, Plaintiffs retained LatinoJustice PRLDEF ("LJP"), a not-for-profit law organization located in Central Islip, New York to represent them in this action. *See* DE 48. Plaintiffs have submitted the Declarations of LJP's Senior Counsel Natasha Lycia Ora Bannan, Esq. and Associate Counsel Nathalia Alejandra Varela, Esq., along with LJP's contemporaneous billing records in support of the request for attorneys' fees. *See* Declaration of Natasha Lycia Ora Bannan, Esq. ("Bannan Decl.") [DE 47-3]; Declaration of Nathalia Alejandra Varela, Esq. ("Varela Decl.") [DE 47-4]. The contemporaneous billing records describe the specific tasks counsel performed on behalf of the Plaintiffs, the dates on which the tasks were performed, and the amount of time expended. *See* Bannan Decl., Exs. D, E [DE 47-19; DE 47-18]; Varela Decl., Exs. H, I [DE 47-22; DE 47-23]. Plaintiffs seek fees for the following hours expended: (1) 231.78 hours by Attorney Bannon at an hourly rate of $310.00; (2) 208.78 hours by Attorney Varela at an hourly rate of $260.00; and (3) 16.7 hours by both Attorneys Bannan and Varela for paralegal work/administrative tasks they performed at an hourly rate of $100 on this matter.[11] Bannan Decl ¶ 6; Varela Decl ¶ 19.

Attorney Bannon graduated from the City University of New York School of Law where she served as Editor-in-Chief of the Law Review. Bannon Decl. ¶ 17. She was admitted to practice in New York in 2012. After law school, she served as Law Clerk to Hon. Ronald Ellis and subsequently as a Legal Fellow at the Center for Reproductive Rights. *Id*. ¶ 18. Her practice is focused on employment discrimination issues, wage and hour cases, and civil right actions and

---

[11]    Notwithstanding the reduced hours for which fees are sought, the contemporaneous billing records reflect an expenditure of 254.7 hours by Attorney Bannon and of 244.8 hours by Attorney Varela. *See* Bannon Decl., Exs. D, E; Varela Decl., Exs. H, I.

she is currently Senior Counsel at LJP.  Bannon Decl., Ex. G.  Since joining LJP and the

Latin@s at Work Project, Attorney Bannon has brought affirmative litigation as lead counsel in

state and federal courts.  Bannon Decl. ¶ 19.  She is fluent in Spanish, is an adjunct professor at

John Jay College of Criminal Justice, and has written a variety of articles on human rights topics.

Bannon Decl., Exs. F, G.

Based on Attorney Bannon's background and experience, the Court finds that the

requested hourly rate of $310 for her services falls within the parameters found reasonable by

other courts in this District for employment discrimination litigation.  *See Centro de la*

*Comunidad Hispana de Locust Val. V. Town of Oyster Bay,* CV10-2262, 2019 WL 2870721, at

*2 and Appendix A (E.D.N.Y. June 18, 2019), *report and recommendation adopted*, 2019 WL

2869150 (E.D.N.Y. July 3, 2019) (awarding LatinoJustice PRLDF attorney who graduated law

school in 2012 an hourly rate of $300); *Gutierrez*, 2018 WL 3432786, at *13 (approving an

hourly rate of $300 for "senior associates with 7 and 13 years of experience respectively" in

employment discrimination matter involving an unopposed motion for default judgment);

*Munson*, 2017 WL 4863096, at *11 (recommending an hourly rate of $300 for counsel with

"significant experience handling civil rights matters" in employment discrimination matter);

*Manswell*, 2017 WL 9487194, at *21 (recommending an hourly rate of $300 for attorney "who

has ten years of experience in employment law and who has twice been recognized as a "rising

star" in the New York metropolitan area by the *Super Lawyers* magazine").

Attorney Varela also graduated from the City University of New York School of Law and

was admitted to practice in New York in 2016.  Varela Decl. ¶ 32.  From May 2016 to April

2017, Varela was a staff attorney for Bronx Legal Services in the Housing Unit, working with

organizers to bring multi-plaintiff litigations on behalf of Bronx tenants.  *Id*. ¶ 34.  One litigation

involved an Article 78 proceeding on behalf of 15 tenants challenging rent increases. Attorney Varela also brought a novel case in Supreme Court, Bronx County and successfully obtained a temporary restraining order against a landlord's attempts to evict clients from their homes. *Id*. ¶¶ 34, 35. As Associate Counsel at LPJ and has been engaged in the practice of employment discrimination and wage and hour litigation for approximately two (2) years prior to the instant motion being filed. Varela Decl. ¶¶ 1, 32-36*. She has represented clients before the New York State Department of Labor, the EEOC, the NLRB and the Worker's Compensation Board. Id.* ¶ 36. As lead counsel, she settled a class action pregnancy discrimination case in the Eastern District of New York and has litigated other civil right cases. *Id.* ¶¶ 36, 37. Based on Attorney Varela's background and experience in practicing law for nearly five years, the Court finds that the requested hourly rate of $260 for her services falls within the parameters found reasonable by other courts in this District for employment discrimination litigation. *See Trustees of Plumbers Local Union No. 1 Welfare Fund, Additional Sec. Benefit Fund, Vacation & Holiday Fund, Trade Educ. Fund, 401(k) Sav. Plan v. Temperini Mech. Inc.*, 18 CV 2596, 2020 WL 571680, at *5 (E.D.N.Y. Jan. 13, 2020), *report and recommendation adopted sub nom. Trustees of Plumbers Local Union No. 1 Welfare Fund v Temperini Mech. Inc.*, 2020 WL 565410 (E.D.N.Y. Feb. 5, 2020) (awarding hourly rate of $285 per hour to the Local 1 Funds and $275 per hour to the National Funds for 2014 law school graduate); *Reiter v. Maxi-Aids, Inc.*, No. 14 CV 3712, 2019 WL 1641306, at *4 (E.D.N.Y. Apr. 16, 2019) (noting propriety of awarding up to $450 per hour for partners and up to $325 for associates in fee shifting cases); *Centro de la Comunidad Hispana de Locust Val. V. Town of Oyster Bay,* CV10-2262, 2019 WL 2870721, at *2 and Appendix A (E.D.N.Y. June 18, 2019), *report and recommendation adopted,* 2019 WL 2869150 (E.D.N.Y. July 3, 2019) (awarding LatinoJustice PRLDF attorney who graduated law from

school in 2012 an hourly rate of $300); *McLaughlin v. IDT Energy,* No. 14 CV 4107, 2018 WL 3642627, at *17 (E.D.N.Y. July 30, 2018) (rates typical to the Eastern District noted to be . . . "$300 for associates with three to five years of experience, $250 for associates with fewer than three years of experience").

The Court also finds that an hourly rate of $100 requested for work done by Attorneys Bannon and Varela which they acknowledge and characterize as paralegal work or administrative work is reasonable. *See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Or.*, No. 09-CV-3855, 2018 WL 1701944, at *5 (E.D.N.Y. Mar. 31, 2018) (noting that courts in this District have awarded rates between $75 to $100 per hour for work performed by paralegals, and collecting cases); *Abreu v. Congregation Yetev Lev D'Satmar Meats & Poultry, Inc.*, No. 12-CV-272, 2019 WL 2526087, at *5 (E.D.N.Y. June 19, 2019) (finding that $85 hour late for paralegals was reasonable); *Campa Flores v. New Sunstone Mexican Food, Inc*., 17-CV-2941, 2018 WL 6840081, at *6 (E.D.N.Y. Sept. 13, 2018) (finding billing rate of $75 hourly appropriate for paralegals); *Douyon v. NY Med. Health Care, P.C.*, 49 F. Supp. 3d 328, 343 (E.D.N.Y. 2014) (finding $90 to $100 hourly rate reasonable for paralegals).

The Court also recognizes that this case involves a sizable number of plaintiffs and the organization saved on interpreter costs because the bilingual attorneys here are uniquely situated to effectively communicate with their clients. *See* Pls.' Mem. at 41. Morever, the damages here are more complex than the average default action in a Title VII case. This is not a case where Plaintiffs are seeking backpay, for example, where such amounts are readily ascertainable. All ten Plaintiffs here are solely seeking damages based on the emotional distress they suffered at the hands of the Defendants. Plaintiffs' counsel has pointed out that "[w]hile discrimination against low-income, Latino immigrant workers is not novel, it is a Herculean effort to organize ten

workers to participate in an administrative and then federal action to affirmatively defend their civil rights." Pls.' Mem. at 32.   Based on the history and chronology of this case, the Court agrees.

Having reviewed the contemporaneous time records, the Court observes that Plaintiffs show 457.26 hours incurred in litigating this matter.  Plaintiffs filed charges of discrimination with the EEOC and on September 25, 2018, they received their Right to Sue Notices "indicating the agency had made an adverse inference and that Defendant Princess Diner engaged in unlawful discrimination."  Compl. ¶ 27.  "A complaining party who is successful in state administrative proceedings after having her complaint under Title VII referred to a state agency in accordance with the statutory scheme of that Title is entitled to recover attorney's fees in the same manner as a party who prevails in federal court."  *Carey v. New York Gaslight Club, Inc.*, 598 F. 2d 1253, 1260 (2d Cir. 1979), *aff'd,* 447 U.S. 54 (1980).  Consequently, Plaintiffs are entitled to attorneys' fees for time expended both in the preliminary administrative proceeding as well as in this federal court action.

In their respective Declarations, Attorney Bannan and Attorney Varela have included summary charts of their hourly rates, the number of hours expended at their regular rate, the number of hours expended for travel time at a 50% reduction in the hourly rates, and an overall total of fees requested based on those hours.  *See* DE 47-3 and 47-4.  There are some minor discrepancies between the two charts which the Court has determined is the result of a mathematical error in the Bannan chart.  On that basis, the Court references here are to the Varela chart.  Plaintiffs seek fees for 457.26 hours billed in total.   With respect to Attorney Bannan, the chart first reflects 206.28 hours at $310 per hour for a total of $63,946.80.  The chart also reflects 25.5 travel hours billed at half the hourly rate, or $155 per hour, for a total of $3,952.50.  As to Attorney Varela, the chart first reflects 187.38 hours at $260 per hour for a

total of $48,718.80.  The chart also reflects 21.4 travel hours billed at half the hourly rate, or $130 per hour, for a total of $2,782.00.  The chart also shows 16.7 "administrative hours" billed by Bannan and Varela at the rate of $100 per hour for a total of $1670.00.  Adding these totals together yields an overall request for $121,070.10.[12]

The Court also takes note of the "Billing Judgment" sections of both the Bannan and Varela Declarations.  DE 47-3, ¶¶ 11-16; DE 47-4, ¶¶ 26-31.   The attorneys have self-audited their billing records to deduct time for which they are not seeking reimbursement.  These fees deducted from LJP's submitted billing include, among other things (1) time spent on the original motion for default judgment which had to be amended and re-submitted; (2) all time contributed by Deputy General Counsel Jose Perez; (3) in excess of 25 hours for work completed by legal assistants and administrative staff; (4) an 8% reduction of hours by Attorney Bannan and 10% by Attorney Varela to ensure non-duplication of billing for tasks; (5) 50% reduction in hourly rates for all travel hours; and (6) an hourly rate reduction to $100 for time spent on administrative tasks by both attorneys.  *See* Bannen Decl. ¶¶ 11-16; Varela Decl. ¶¶ 26-31.

While the Court applauds the self-audit, the billing records are not flawless.  Some of the entries are vague and do not enable the Court to determine if the work performed was reasonable or unduly duplicative.  For instance, "emails," and "legal research" are among the vague entries which appear numerous times without further description.  *See Vargas Garcia v. Park,* No. 18-CV-10650, 2019 WL 6117596, at *4 (S.D.N.Y. Nov. 18, 2019) (entries such as "e-mail" without any indication of the subject matter of the email message, the person(s) to whom the email message was sent or the relationship if any the email message had to the litigation too vague to

---

[12]    The Varela chart total is off by $1 which the Court attributes to a mathematical calculation error.

allow court to determine reasonableness of time expended.); *Seong Soo Ham v. Sushi Maru Express Corp.,* 15-CV-6138, 2017 WL 9482112, at *3 (E.D.N.Y. Aug. 18, 2017), *report and recommendation adopted,* 15-CV-06138, 2017 WL 4023131 (E.D.N.Y. Sept. 13, 2017), *aff'd,* 736 Fed. App'x 19 (2d Cir 2018) (excluding time for vague entries such as reviewing "recent case law" and "various emails" and a conference "with [colleague re status"); *Tito v. Rubin & Rothman, LLC,* 12-CV-3464, 2014 WL 1092845, at *4 (E.D.N.Y. Mar. 18, 2014) (vague time entries justifying a percentage reduction in the total hours included emails between co-counsel which contained no information as to the purpose of the emails, the issues discussed between co-counsel, or the issues researched and their relation to the current matter).

In addition, a number of time entries reflect "block billing" which makes it "difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided." *Linde v. Arab Bank, PLC*, 293 F.R.D. 138, 142 (E.D.N.Y. 2013) (citation omitted). "While 'block billing is not prohibited in this Circuit' ... [it] renders it difficult to determine whether, and/or the extent to which, the work done by [the] attorneys is duplicative or unnecessary." *Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 277 F. Supp. 2d 323, 325–26 (S.D.N.Y. 2003) (quoting *Rodriguez v. McLoughlin*, 84 F. Supp. 2d 417, 427 (S.D.N.Y. 1999)). Further, several entries account for time spent on administrative or non-compensable work, including clerical tasks, such as electronic filing, scanning, organizing files, communicating with process servers, and printing documents. *See DeMarco v. Ben Krupinski Gen. Contractor, Inc.*, 2014 WL 3696020, at *9 (E.D.N.Y. July 22, 2014) ("Courts may ... deduct time spent on clerical tasks, such as faxing documents, preparing duplicates, serving papers on defendants, and filing documents.") (citation and quotation marks omitted). Although Plaintiffs deducted a total of 16.7 hours from the cumulative time spent by both counsel for

administrative tasks which were highlighted in the contemporaneous billing records, the Court has identified other entries in addition to those highlighted that are not compensable at an attorneys' billing rate. *See Cabrera v. Schafer,* No. 12-CV-126323, 2017 WL 9512409, at *3 (E.D.N.Y. Feb. 17, 2017), *report and recommendation adopted*, No. 12-CV-6323, 2017 WL 1162183 (E.D.N.Y. Mar. 27, 2017) ("[W]here counsel seeks compensation for time spent completing administrative tasks or work that should have been accomplished by a less-skilled practitioner, '[u]niform percentage cutbacks are warranted.'") (citation omitted).

In considering a reduction in an attorney's fee award, a court need not make item-by-item findings. *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994). Rather, a court "has the authority to make across-the-board percentage cuts in hours as a practical means of trimming fat from a fee application." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987) (citation and quotation marks omitted); *Manswell,* 2017 WL 9487194, at *23 (reducing hours by 20% due to attorney's billing for administrative tasks, block billing, and excessive expenditure of time in default judgment context); *Green v. City of New York*, 403 Fed. App'x 626, 630 (2d Cir. 2010) (affirming across-the-board reduction of 15% due to "pervasive block billing" in time entries submitted by counsel); *Roberts v. United Parcel Service, Inc.*, 2016 WL 1425766, at *5 (E.D.N.Y. Mar. 16, 2016) (recommending a 20% across-the-board reduction to account for excessive billable hours in employment discrimination case), *report and recommendation adopted by*, 2016 WL 1441318 (E.D.N.Y. Apr. 8, 2016).

For the reasons discussed above, the Court find that an across-the-board reduction of 10% of the hours billed by Plaintiffs' counsel in this case is appropriate, and therefore respectfully recommends to Judge Hurley that attorneys' fees be awarded in the amount of $109,088.10, as follows:

| Individual | Hourly Rate Requested and Granted | Hours Requested | Sub-Total | 10% Reduction | Total |
|---|---|---|---|---|---|
| Natasha Bannan | $310 | 206.3 | $63,953.00 | $6,395.30 | $57,557.70 |
| *Travel* | $160 | 25.5 | $ 4,080.00 | $ 408.00 | $ 3,672.00 |
| Nathalia Varela | $260 | 187.4 | $48,724.00 | $4,872.40 | $43,851.60 |
| *Travel* | $130 | 21.4 | $ 2,782.00 | $ 278.20 | $2,503.80 |
| Paralegal | $100 | 16.7 | $1,670.00 | $ 167.00 | $1,503.00 |
| | | | **Total Fees:** | | **$109,088.10** |

### B.      Costs

Plaintiffs seek costs in the amount of $1,527.95.  Pls.' Mem. at 44.  A party awarded attorneys' fees is also "entitled to compensation for those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998); *Roberts v. United Parcel Serv., Inc.*, 13 CV 6161, 2016 WL 1425766, at *6 (E.D.N.Y. Mar. 16, 2016]), *report and recommendation adopted*, 2016 WL 1441318 (E.D.N.Y. Apr. 8, 2016) ("Reasonable out-of-pocket expenses are generally reimbursed as a matter of right in connection with an award of attorneys' fees.") (quoting *Hugee v. Kimso Apts. LLC*, 852 F.Supp.2d 281, (E.D.N.Y. 2012)).  Costs for filing, process servers, and photocopying, for example, are generally recoverable. *Kuzma v. IRS*, 821 F.2d 930, 933 (2d Cir. 1987); *Sass*, 6 F. Supp. 3d at 263; *Stanczyk v. City of New York*, 990 F. Supp. 2d 242, 253 (E.D.N.Y. 2013) (citation omitted).  The party seeking to recover such costs, however, "bears the burden of adequately documenting and itemizing the costs requested."  *Ganci v. U.S. Limousine Serv. Ltd.*, 2015 WL 1529772, at *8 (E.D.N.Y. Apr. 2, 2015) (citations omitted); *Shukla v. Sharma*, No. 07-CV-2972, 2010 WL 8435857, at *14 (E.D.N.Y. Dec. 15, 2010) (plaintiff bears

the burden to submit sufficient documentation in support of costs). "A party is not entitled to recover costs when its application fails to provide substantiation for the costs sought." *D'Annunzio v. Ayken, Inc.*, No. 11-CV-3303, 2015 WL 5308094, at *8 (E.D.N.Y. Sept. 10, 2015).

Plaintiffs seeks $1,527.95 in costs, comprised of $400.00 for the filing fee, $336.45 for the process service fee, and $150.60 for meals, and $640.90 for traveling expenses. *See* Costs Itemization, Ex. L to Bannan Decl. [DE 47-26]. "While travel costs are recoverable, the Court cannot award costs where the requesting party has not provided adequate documentation." *Chauca v. Park Mgt. Sys., LLC,* 10 CV 05304, 2016 WL 8117953, at *6 (E.D.N.Y. July 18, 2016). Providing a breakdown of costs alone is insufficient documentation. *Id*. (citing *Shukla*, 2010 WL 8435857, at *14). Here, in support of this request, Plaintiffs have submitted a single page general ledger itemization of the costs incurred, but have not provided any invoices, receipts, or other documentary proof substantiating each of the costs incurred. *See Lee v. Santiago*, No. 12-CV-2558, 2013 WL 4830951, at *5 (S.D.N.Y. Sept. 10, 2013) ("A mere assertion that a certain cost was incurred … is insufficient, where such an assertion is made in a conclusory fashion in a brief or bill of costs, without a supporting affidavit, declaration, or documentation."). Additionally, LJP has not submitted receipts for "business meals" ($150.60) or One World Judicial Services Inc. ($336.45). Although the itemization sheet refers to various "invoices," there are no actual invoices or receipts accompanying the ledger to support these expenditures. *See Shukla,* 2010 WL 8435857, at *15. While the Court may take judicial notice of the $400.00 filing fee reflected on the docket report, *see Ortega v. JR Primos 2 Rest. Corp.,* No. 15-CV-9183, 2017 WL 2634172, at *8 (S.D.N.Y. June 16, 2017) (taking judicial notice of

filing fee on docket), the Court cannot recommend an award of costs for the remaining expenditures in the absence of supporting documentation.

Accordingly, the Court respectfully recommends to Judge Hurley that Plaintiffs be awarded costs in the amount of $400.00 at this time, with leave to provide the additional necessary documentation within 30 days.

## VI.  CONCLUSION

For the foregoing reasons, this Court respectfully recommends to Judge Hurley that Plaintiff's motion for default judgment be GRANTED, in part, and DENIED, in part.  As to liability and damages, the Court respectfully recommends the following:

1.    Default judgment be granted with respect to Plaintiffs Tenecora, Romero, Flores, Lalvay and Ramos on their sex based discrimination claims against Defendants in violation of Title VII and the NYSHRL (Counts I and V);

2.    Default judgment be granted with respect to Plaintiffs Tenecora, Flores, Ascenio, Barrientos, Morocho, Romero, Ramos, Lalvay, Gonzalez and Varela's race based hostile work environment claims against Defendants in violation of Title VII and the NYSHRL (Counts II and VI);

3.    Default judgment be denied with respect to Plaintiffs' race based discrimination claims in violation of Title VII, NYSHRL, and/or Section 1981 (Counts III, IV, and VII);

4.    Plaintiffs be awarded compensatory damages, apportioned as recommended *supra*, in the total amount of $226,000.00 against Defendants, jointly and severally;

5.    Plaintiffs Morocho, Romero and Tenecora be awarded punitive damages in the amount of $5,000.00, $10,000.00 and $15,000.00, respectively, against Defendant Ba-Kal Restaurant;

6.    Plaintiffs be awarded attorneys' fees in the amount of $109,088.10;

7.    Plaintiffs be awarded costs in the amount of $400.00 at this time, with leave to provide the additional necessary documentation within 30 days.

## VII.    OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Denis R. Hurley. Any requests for an extension of time for filing objections must be directed to Judge Hurley prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *see also Johnson v. Woods*, 426 Fed. Appx. 10, 11 (2d Cir. 2011) (citing *Cephas v. Nash*, 328 F. 3d 98, 107 (2d Cir. 2003)); *Savoie v. Merchants Bank*, 84 F. 3d 52, 60 (2d Cir. 1996) (citing *McCarthy v. Manson*, 714 F.2d 234, 237 n.2 (2d Cir. 1983)).

**Counsel for Plaintiffs is directed to serve a copy of this Report and Recommendation on both the corporate Defendant and the individual Defendant Richard Bivona forthwith by overnight mail and first-class mail and to file proof of such service on ECF by December 4, 2020.**

**SO ORDERED:**

Dated: Central Islip, New York
        November 30, 2020

/s/ A. Kathleen Tomlinson
A.  KATHLEENTOMLINSON
United States Magistrate Judge