UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LINA TENECORA, LENNY ROMERO, DORA
ALICIA GARCIA ASCENIO, JOSE ANTONIO
BARRIENTOS, ESTELA FLORES, ROCIO
GONZALEZ, GLORIA LALVAY, MANUEL
MOROCHO, HERMELINDA RAMOS, and
ELISA VARELA,

                            Plaintiffs,

 - against -

BA-KAL RESTAURANT CORP., d/b/a
PRINCESS DINER and/or SOUTHAMPTON
PRINCESS DINER, and RICHARD BIVONA,

                          Defendants.
----------------------------------------------------------------X

**ORDER ADOPTING IN PART REPORT AND RECOMMENDATION**

2:18-cv-7311 (DRH) (AKT)

**HURLEY, Senior District Judge:**

## INTRODUCTION

Presently before the Court is the captioned Plaintiffs' Objection to the November 30, 2020 Report and Recommendation of Magistrate Judge A. Kathleen Tomlinson (the "R&R" [DE 49]) recommending the Court grant in part, and deny in part, their motion for default judgment against the Defendants Ba-Kal Restaurant Corp., d/b/a Princess Diner and/or Southampton Princess Diner, and Richard Bivona (collectively "Defendants"). For the reasons stated below, the R&R is ADOPTED IN PART and Plaintiffs' motion for default judgment is GRANTED.

## BACKGROUND

The Court adopts the R&R's detailed Background Section, to which no objection is lodged. (R&R at 2–16). In short, Plaintiffs are "ten Latino and Latina immigrant low-wage restaurant workers" who have suffered Defendants' hostile work

environment and discriminatory remarks against their ethnicity, race, national origin, and/or sex. (*Id.* at 3; Plaintiffs' Objection to Report and Recommendation, at 9 ("Pls. Obj.") [DE 52]). Defendants are also alleged to have unlawfully withheld Plaintiffs' wages between August 2016 and December 2016. (Pls. Obj. at 20 (citing Compl. ¶¶ 17, 46, 152, 176)). Plaintiffs bring three claims: (1) hostile work environment based on race, ethnicity, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), *see* Compl. ¶¶ 142–46 (Count II), ¶¶ 166–70 (Count VI); (2) sex-based discrimination in violation of Title VII and the NYSHRL, *see* Compl. ¶¶ 137–41 (Count I), ¶¶ 161–65 (Count V); and (3) race-based discrimination in violation of Title VII, the NYSHRL, and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), *see* Compl. ¶¶ 147–54 (Count III), ¶¶ 155–60 (Count IV), ¶¶ 171–78 (Count VII).

Plaintiffs obtained a certificate of default on July 22, 2019, [DE 35], and moved for entry of default judgment on February 14, 2020, [DE 47]. This Court referred Plaintiffs' motion to Magistrate Judge Tomlinson, who issued her R&R on November 30, 2020. [DE 49]. The R&R recommended granting Plaintiffs' motion on their hostile work environment and sex-discrimination claims. (R&R at 20–29). However, the R&R recommended denying their motion on the race-based discrimination claims. (*Id.* at 29–41).

The R&R determined that Plaintiffs failed to allege facts supporting an inference that they suffered adverse employment actions based on their race. (R&R

at 31 (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)).  All but one of Defendants' alleged employment actions were insufficiently "adverse" because they did not materially change the terms and conditions of employment.  (R&R at 32–37).  Defendants' withholding Plaintiffs' wages, while sufficiently adverse, was not alleged to have occurred "under circumstances [giving] rise to 'an inference of discriminatory intent.'"  (R&R at 37–41).  According to the R&R, Plaintiffs failed to link Defendants' derogatory remarks "to the decision to withhold wages to an extent that discriminatory intent may be inferred."  (*Id.*).

Plaintiffs contend the R&R erred (i) by applying the incorrect race-discrimination standard, which skewed its analysis of Plaintiffs' allegations, and (ii) by failing to draw a nexus between the allegations of discriminatory intent and Defendants' adverse employment actions.  To the extent the Court sustains Plaintiffs' objection, Plaintiffs request it "revisit" the R&R's damages assessment, which would award nothing on the race-discrimination claims.  (Pls. Obj. at 10 n.3).[1]

## DISCUSSION

Federal Rule of Civil Procedure 72(b) provides that when a magistrate judge issues a report and recommendation on a matter "dispositive of a claim or defense of a party," the district court judge shall make a *de novo* determination of any portion

---

[1]       Despite Plaintiffs faulting Magistrate Judge Tomlinson for "misappl[ying] the *McDonnell Douglas* framework to [their] . . . direct evidence of discrimination," the Court parenthetically notes that *Plaintiffs*—not Judge Tomlinson—first asserted that *McDonnell Douglas* applies here. Pls. Mot. for Default Judgment at 8–9 [DE 47-2].   Moreover, whereas Plaintiffs' objection devotes twenty pages to the race-discrimination claim, their submission to Judge Tomlinson devoted only one cursory paragraph. *Compare id.*, *with* Pls. Obj. at 11–30.

of the magistrate judge's disposition to which specific written objection has been made.  Fed. R. Civ. P. 72(b).

Race-based discrimination[2] claims require a plaintiff to "plausibly allege that (1) the employer took adverse action against him, and (2) his race . . . was a motivating factor in the employment decision."  *Vega v. Hempstead Union Free Sch.*

---

[2]      The term "race" is used as shorthand for "race, ethnicity and/or national origin," which conforms to Plaintiffs' and the R&R's usage.  Compl. ¶¶ 147–54, 155–60, 171–78 (Counts III, IV and VII alleging discrimination on the basis of race, ethnicity and/or national origin); R&R at 25, 29–30.

This understanding aligns with Supreme Court and Second Circuit precedent, which draws minimal distinction between the three.  In *St. Francis College v. Al-Khazraji*, the Supreme Court held discrimination based on "ancestry or ethnic characteristics" is "racial discrimination that Congress intended [Section] 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory."  481 U.S. 604, 609–13 (1987).  In *Village of Freeport v. Barrella*, the Second Circuit held that "discrimination based on ethnicity, including Hispanicity or lack thereof, constitutes racial discrimination under Title VII" and Section 1981.  814 F.3d 594, 600–07 (2d Cir. 2016).  The Second Circuit has also noted that "a claim of discrimination based on Hispanic ethnicity or lack thereof may *also* be cognizable under the rubric of national-origin discrimination, depending on the particular facts of each case."  *Id.* (emphasis in original) (citing *United States v. Brennan,* 650 F.3d 65, 134 (2d Cir. 2011) and *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 313 (2d Cir. 1997)).

The Supreme Court and the Second Circuit likewise recognize, in a variety of contexts, that "treating groups differently based on the members' alienage [is] akin to discriminating against a group because of their race or color."  *Dandamudi v. Tisch*, 686 F.3d 66, 73 (2d Cir. 2012) (describing the Supreme Court's holding in *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948)); *cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975) ("Even if they saw enough to think that the occupants were of Mexican descent, this factor alone would [not] justify . . . a reasonable belief that they were alien . . . ."); *Milan-Hernandez v. Barr*, 965 F.3d 140, 148 (2d Cir. 2020) ("We have recognized that, when a law enforcement officer detains and questions an individual about her immigration status although she is not suspected of a crime, those circumstances offer a strong suggestion that the search or seizure was improperly based on race."); *Anderson v. Conboy*, 156 F.3d 167, 174 (2d Cir. 1998) ("The desire to protect Chinese immigrants from discrimination, however, is as consistent with prohibiting racial discrimination as with prohibiting alienage discrimination.").

*Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).[3]  A plaintiff "may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.*  "[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination, . . . it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2013) (internal citations, alterations, and quotation marks omitted).

Understood in context, Plaintiffs' objection concerns the second prong of the race-discrimination analysis: whether "wages were withheld under circumstances which give[] rise to an 'inference of discriminatory intent.'"  R&R at 37; *see Vega*, 801 F.3d at 88–89 (addressing first whether there was adverse employment action, and then whether race was a "motivating factor in the employment decisions").  Indeed, both the R&R and Plaintiffs tacitly agree that the withholding of Plaintiffs' wages was an adverse employment action.  *See* Pls. Obj. at 19–29 ("[T]he withholding of wages clearly meets the standard for adverse action as reflected in Title VII."); *see generally* R&R at 37–40 (analyzing only whether withholding wages could be tied to discriminatory animus).[4]

---

[3]    "Courts apply the same standard in analyzing Title VII, the NYSHRL, and Section 1981 race discrimination claims."  R&R at 25 (citing *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) ("Although the § 1981 claim is against [the individual defendant] and the Title VII and NYSHRL claims are against the School District, the analysis is the same.")).

[4]    Plaintiffs say that Defendants' "actions and the context that they were made," "taken together," materially altered the terms and conditions of their employment.

## I.     Race as a Motivating Factor to Withholding Plaintiffs' Wages

Plaintiffs object that the R&R incorrectly deemed their allegations of discriminatory intent "conclusory" and ignored the "direct evidence of discrimination." Pls. Obj. at 11.  Plaintiffs contend this error led the R&R to misapply the *McDonnell Douglas* framework and to decline to infer discriminatory motivation. *Id.* at 19, 21.

Employment discrimination claims can be borne out through direct or indirect means. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *Vega*, 801 F.3d at 87.  "'Direct' and 'indirect' describe not the quality of the evidence presented, but the manner in which the plaintiff proves his case." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1185 (2d Cir. 1992).  "'Direct evidence' of discrimination is something of a misnomer"; it is best understood in contrast with what "makes out a *McDonnell Douglas* prima facie case[, which is] evidence from which an inference of discrimination arises only because 'it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection,' and which inference is therefore immediately

---

Pls. Obj. at 19–20.  However, for discrimination claims, purportedly adverse employment actions are analyzed individually and not in the aggregate. *Kelly v. N.Y. State Off. of Mental Health*, 200 F. Supp. 3d 378, 397 n.11 (E.D.N.Y. 2016) (holding, despite being "viewed in the aggregate" in other contexts, "adverse actions in the discrimination context must be evaluated individually"); *Lewis v. Boehringer Ingelheim Pharm., Inc.*, 79 F. Supp. 3d 394, 412–13 (D. Conn. 2015); *Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("[T]here is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim."); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 356 n.22 (S.D.N.Y. 2006).  To the extent Plaintiffs object to this aspect of the R&R's analysis, they are overruled.

dispelled once the employer has produced evidence of a nondiscriminatory reason." *Cartagena v. Ogden Servs. Corp.*, 995 F. Supp. 459, 462 (S.D.N.Y. 1998) (Sotomayor, J.) (quoting *Texas Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). Simply, direct evidence exists where "an impermissible criterion," like race, "was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996) (emphasis in original) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)).

Direct evidence need not be the "proverbial smoking gun, i.e., an unequivocal statement by an employer that an employee is being terminated for an impermissible reason." *Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 768–69 (S.D.N.Y. 2002) (citing *Cartagena*, 995 F. Supp. at 462). "Rather, direct evidence is evidence 'directly *reflecting* the alleged discriminatory attitude.'" *Id.* (emphasis in original) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997)). It can take the form of "a workplace policy, practice or decision [that] relies expressly on a protected characteristic" or "conduct or statements by persons involved in the decisionmaking process." *Young v. United Parcel Serv.*, 575 U.S. 206, 135 S.Ct. 1338, 1345 (2015); *Lightfoot*, 110 F.3d at 913; *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992). A pervasive use of racial slurs and derogatory language can directly evidence discriminatory animus. *E.g., Bonilla v. City of New York*, 2019 WL 6050757, at *13– 14 (S.D.N.Y. 2019) (supervisor repeatedly calling plaintiff an alleged racial slur evidenced "direct discriminatory animus" sufficient to defeat summary judgment); *Azar v. TGI Friday's, Inc.*, 945 F. Supp. 485, 498–99 (E.D.N.Y. 1996) (holding a

"pattern of ridicule," comprised of anti-Iranian slurs, "obscenities[,] and derogatory terms" used "in a hazing manner[,]" was "direct evidence of discriminatory animus"); *see also*, *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861–62 (5th Cir. 1993) ("Pippen's routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions," not "an innocent habit. . . . [T]he term [n-----] is a universally recognized opprobrium, stigmatizing African-Americans because of their race.").

Here, Plaintiffs plead discrimination "directly" through Defendants' alleged statements and acts, which undoubtedly reflect an attitude discriminatory against Latino/as. Defendants' regular insults and ethnic slurs, *e.g.*, Compl. ¶¶ 14–15, 37–38, 64–65, 75–77, 85, 102, 115, 132, created a "climate of disrespect and disdain for labor contributions compared to non-Latino employees." *Id.* ¶ 47; *e.g.*, *id.* ¶ 71 (if Plaintiff Barrientos tried to eat "food other than that which was permitted," his supervisor would remark, '[Y]ou don't get to eat that food in your country, so why should you get to eat it here?'"); *id.* ¶ 72 ("Kalogeras . . . dissuade[d] Latino/a employees] from reporting Defendants' abusive and discriminatory behavior by telling them, 'if you complain (about my treatment), I will call immigration officials on you.'"); *see also, e.g.*, *id.* ¶¶ 5, 74, 92, 101, 112, 115, 132. Many of these statements do not expressly mention, and therefore are facially unconnected to, Defendants' withholding of wages – which forestalled the R&R from inferring discriminatory intent in the wrongful nonpayment. Nevertheless, these statements provide the backdrop against which the rest of the case is viewed; they are "the relevant

background evidence . . . shedding light on Defendants' motivation and thus bolster[ing] [the] claim that Defendants treated [Plaintiffs] differently" on account of race. *Vega*, 801 F.3d at 88.

Understood in this setting, one of Defendants' statements displays, if not a "smoking gun," then a "thick cloud of smoke" of direct evidence that Defendants withheld Plaintiffs' wages with discriminatory intent. *Tyler*, 958 F.2d at 1187. At Paragraph 104, Plaintiffs allege:

> Defendants began to withhold Plaintiff Lalvay's wages in August 2016. After not being paid for several weeks, she notified [her supervisor John] Kalogeras that she was going to call the New York State Department of Labor to recover her wages. Kalogeras responded by telling her that she would be the one to "get in trouble" and referenced immigration authorities. Plaintiff Lalvay felt intimidated by his threat to retaliate against her if she spoke out.

Compl. ¶ 104.[5]

It is possible that Supervisor Kalogeras's[6] statement exemplifies a "stray remark[]" rather than reflects discriminatory bias. To determine which it better

---

[5]    The R&R states that while "Kalogeras made a slew of ethnically and racially degrading and discriminatory remarks to them in the course of their employment, [Plaintiffs] do not assert that Kalogeras was involved in the decision to withhold their wages." R&R at 38. The Court respectfully disagrees. While Plaintiffs do not explicitly so state, the facts as alleged make it reasonable to so infer. "Plaintiffs worked under Kalogeras, the main supervisor" and self-described "king of the castle." Compl. ¶¶ 4, 23, 36, 42, 54, 76, 112. Plaintiffs went to Kalogeras, as well as Bivona, to dispute the wrongful nonpayment. *Id.* ¶ 104.

[6]    There is no objection to the R&R's determination that the corporate defendant Ba-Kal Restaurant could be liable under Title VII, NYSHRL, and Section 1981, and that individual defendant Bivona could be held liable the NYSHRL and Section 1981. Further, there is no objection that the NYSHRL enables the Court to hold individuals, like Defendant Bivona here, liable for discriminatory conduct perpetrated by others under his direct supervision, like Kalogeras. R&R at 24 n.4, 26, 29 n.5; Pls. Obj. at 12 n.5.

illustrates, the statement must be analyzed through four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010). Applied here: (1) the Plaintiffs' supervisor, (2) at the outset of the period in which Defendants withheld Plaintiffs' wages (August 2016 through December 2016), (3) chilled, deterred, and threatened Plaintiff Lalvay with language rooted in racism,[7] (4) were she to report Defendants for wrongful nonpayment. *See id.* ¶¶ 104, 176.[8]

Even if one refuses, absent more proof, to construe threats to Latino/a employees of "trouble" from "immigration authorities" as reflecting racism, Defendants' use of similar phrasing exposes its invidious nature. *E.g.*, *id.* ¶¶ 5, 64 ("Plaintiffs would likely be 'swept up' in an immigration raid"); ¶ 72 ("[I]f you complain (about my treatment), I will call immigration officials on you."), ¶ 75 ("Kalogeras said on more than one occasion that he hoped immigration authorities . . . would come and take [racial slur for Latinos/as]."), ¶ 77, ¶ 101 ("When local police

---

[7]     As explained in note 2, "racism" here is construed broadly to include prejudice towards ethnicity and national origin, as well as race. *See supra* note 2.

[8]     Paragraph 104 is but one specific example of (1) Plaintiffs' immediate supervisor or the restaurant owner (2) on a daily basis (3) making facially racist comments (4) on all aspects of Plaintiffs' employments. *E.g.*, Compl. ¶¶ 5, 71, 72, 74, 92, 101, 112, 115, 132.

officers would come into the restaurant as customers, Kalogeras would tell Plaintiff Lalvay in front of her co-workers and clients, 'immigration [authorities] are here.'").

Kalogeras's remark, made in an environment rife with anti-Latino/a sentiment, demonstrates that race was a motivating factor in withholding, and continuing to withhold, Plaintiffs' wages. Despite Kalogeras threatening only Plaintiff Lalvay, Kalogeras's remark reveals discriminatory animus common to all Plaintiffs – their Latino/a race. *See* Compl. ¶ 17 ("Plaintiffs stopped receiving regular wages . . . along with other Latino/a employees. Upon information and belief, white employees' wages were not withheld by Defendants."); ¶ 94 (alleging "openly violent threats by Bivona to dissuade Plaintiff Gonzalez and other Latino/a workers from demanding their due wages"); *see also, id.* ¶¶ 46, 54, 144, 157, 158.

The nexus between the nonpayment of Plaintiffs' wages and race-based discrimination is further bolstered by the allegation that Defendants duly and timely paid their non-Latino/a employees. Compl. ¶¶ 17, 46, 152, 176. While the R&R highlights these allegations as pled "upon information and belief," the Court declines to adopt the R&R to the extent it faults Plaintiffs for doing so. R&R at 4 n.2, 40. "Pleading on the basis of information and belief is generally appropriate" where information is particularly within a defendant's "knowledge and control." *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) (Sotomayor, J.).

The *Boykin* plaintiff brought a race-discrimination claim alleging that, "upon information and belief," discriminatory animus motivated a bank's home equity loan application practices. *Id.* at 204, 214. Specifically, the complaint stated,

> Upon information and belief, persons who were not members of the
> protected classes received loans and were more favorably treated in the
> loan application process than [plaintiff] with regard to the same or
> similar types of properties.

*Id.* at 206 (quoting *Boykin* complaint paragraph 12).  The Second Circuit held "the

names and records, if any, of persons who were not members of the protected classes

and were more favorably treated in the loan application process [was] information

particularly within [the bank's] knowledge and control," and therefore permissibly

alleged "upon information and belief."  *Id.* at 215.  This constituted "a plausible

allegation of disparate treatment" justifying vacatur of the district court's dismissal

order.  *Id.* at 216.  The Court discerns no compelling difference between *Boykin*'s

"information and belief" allegations and those here.[9]  Plaintiffs have therefore

adequately pled discrimination based on race in violation of Title VII, NYSHRL, and

Section 1981.

## II.   Damages

Despite Plaintiffs' correct objection that Defendants impermissibly

discriminated on the basis of race, Plaintiffs offer no explanation as to how damages

should be "revisited" or revised.  Pls. Obj. at 10 n.3.  As the R&R correctly noted,

Plaintiffs bear the burden, even on a motion for default judgment, to prove damages.

R&R at 42 (citing *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro*

---

[9]    The *Boykin* plaintiff's *pro se* status is not a basis to "materially distinguish"
the Second Circuit's holding.  *Meyer v. N.Y. Off. of Mental Health*, 2014 WL 1767818,
at *5 n.8 (E.D.N.Y. May 2, 2014); *Ritterband v. Hempstead Union Free Sch. Dist.*,
2008 WL 3887605, at *8 n.3 (E.D.N.Y. Aug. 20, 2008).

*Found. Contrs. Inc.*, 699 F.3d 230, 234 (2d Cir. 2012)).   The R&R awarded compensatory damages, punitive damages, attorneys' fees, and costs.

### A.   Compensatory Damages

Plaintiffs fail to contest the R&R's compensatory damages analysis, which addressed their emotional harm.   R&R at 46–58.   Following thorough review of the Plaintiffs' submissions, the R&R refused to recommend the amount each requested because no Plaintiff supplied "evidence of any medical or mental health treatment," "medical documentation," or "evidence as to the onset and duration of [the] emotional distress."   R&R at 47 (Tenecora), 49 (Romero), 50–51 (Flores), 52 (Barrientos), 53 (Varela), 54 (Ramos), 55 (Morocho), 56 (Lalvey), 57 (Ascenio), 58 (Gonzalez). Plaintiffs have not remedied this deficiency; their objection does not include any evidence as to medical treatment or other indicia of emotional harm.   The Court therefore adopts the R&R's recommendation on compensatory damages.

### B.   Punitive Damages

The R&R's punitive damages recommendation,[10] as a "discretionary moral judgment," warrants revision in light of Defendants' race-based discrimination in violation of Title VII, NYSHRL, and Section 1981.   *Wiercinski v. Mangia 5, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015).   Title VII and Section 1981 make punitive damages available, but the NYSHRL does not.   42 U.S.C. § 1981a(b)(1); N.Y. Exec. Law § 297(9); *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 101 (2d Cir. 2001).   The R&R

---

[10]   The body of R&R recommends awarding Plaintiff Tenecora $10,000.00 in punitive damages; its conclusion, however, recommends awarding her $15,000.00. *Compare* R&R at 65, *with id.* at 78.   The Court adopts the latter recommendation.

deemed that "Kalogeras' conduct toward Plaintiffs Tenecora, Ramos and Morocho was egregious enough or sufficiently outrageous to warrant punitive damages based on comparable caselaw." R&R at 62–63. This recommendation came without a finding on liability for race discrimination.

Plaintiffs may obtain punitive damages as their employer "engaged in intentional discrimination . . . 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual[s].'" *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 529–30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). Both "malice" and "reckless indifference" require "the employer's knowledge that it may be acting in violation of federal law." *Id.* at 535. "Egregious" or "outrageous" conduct can give rise to an inference that the employer acted with this "requisite evil motive." *Id.* (internal quotation marks omitted); *Farias*, 259 F.3d at 101.

Defendants' racially discriminatory conduct warrants the imposition of punitive damages as to all Plaintiffs. The Complaint permits the reasonable inference that Defendants knew they were violating federal law when they withheld Plaintiffs' wages—the adverse employment action taken with discriminatory intent. For example, in response to Plaintiffs expressed concerns over unpaid wages, "Bivona responded that he did not care if Plaintiff Gonzalez and her co-workers sued him because he had been in jail before and that he was part of the mafia." Compl. ¶ 94. Kalogeras, for his part, took a less cavalier approach – by threatening retaliation against Plaintiffs on fundamentally race-based grounds. *E.g.*, *id.* ¶ 72 ("[I]f you complain (about my treatment), I will call immigration officials on you."), ¶ 104

(Plaintiff Lalvay would "get in trouble" with the "immigration authorities" if she "call[ed] the New York State Department of Labor to recover her wages."). Defendants' withholding of wages was so egregious that, following an investigation by the New York State Attorney General, Bivona and Kalogeras faced criminal charges, with Bivona ultimately serving time. *New York v. Bivona*, No. 01736A-2017 (N.Y. Sup. Ct. - Suffolk Cnty, Crim. Term Dec. 7, 2018) (sentencing Bivona to six months in jail for scheming to defraud and failing to pay employees). Though each took a different approach—Bivona more callous and Kalogeras more vindictive—to potential investigation—which did occur and result in jailtime—each reflects at least reckless indifference towards their violation of federal law.

Accordingly, the Court awards $10,000.00 in punitive damages to each Plaintiff arising out of Defendants' race-based discrimination, in addition to the punitive damages award recommended by the R&R.[11]

### C.    Attorneys' Fees and Costs

As to costs, the R&R awarded Plaintiffs only $400.00 (the judicially-noticeable amount of the filing fee) because they failed to adduce proper documentation for any costs. Plaintiffs have attached to their objection the appropriate documentation for some, but not all, of their costs. *See* Decl. of Lissette Amador [DE 52-1] and accompanying exhibit [DE 52-2]. Specifically, they have provided travel receipts in

---

[11]    As the R&R noted, Title VII's damages cap does not limit the compensatory and punitive damages otherwise available under the NYSHRL. R&R at 65 n.10. Accordingly, the Court adopts the R&R's recommendation regarding the allocation of damages between the Title VII and NYSHRL claims. *Id.*

the amounts of $7.50, $22.25, and $114.84, for a total of $144.59; they have provided business meal receipts in the amounts of $49.00, $44.00, and $43.34, for a total of $136.34; and service of process receipts in the amounts of $64.45, $27.00, $95.00, $80.00, and $70.00, for a total of $336.45.  The exhibit provides documentation to the Court's satisfaction.  With the $400.00 recommended by the R&R, Plaintiffs are awarded a grand total of $1,017.38 for costs.  As to the remainder of the requested fees, Plaintiffs may not recover costs as their "application fails to provide substantiation for the costs sought."  *D'Annunzio v. Ayken, Inc.*, 2015 WL 5308094, at *8 (E.D.N.Y. Sept. 10, 2015).

Lastly, because this Court agrees with certain of Plaintiffs' objections, Plaintiffs are granted leave to supplement their attorneys' fees petition with costs incurred in preparing the objection.  Plaintiff shall file this supplement within fourteen (14) days of this Order.  *S.J., individually and on behalf of K.H. v. N.Y.C. Dep't of Educ.*, 2021 WL 100501, at *6 (S.D.N.Y. Jan. 12, 2021).

## CONCLUSION

For the reasons discussed above, the Court ADOPTS IN PART Magistrate Tomlinson's R&R.  Plaintiffs' motion for default judgment is GRANTED.  As to liability and damages:

1. Default judgment is GRANTED with respect to Plaintiffs Tenecora, Romero, Flores, Lalvay and Ramos's sex-based discrimination claims against Defendants in violation of Title VII and the NYSHRL (Counts I and V);

2. Default judgment is GRANTED with respect to Plaintiffs Tenecora, Flores, Ascenio, Barrientos, Morocho, Romero, Ramos, Lalvay, Gonzalez and Varela's race-based hostile work environment claims against Defendants in violation of Title VII and the NYSHRL (Counts II and VI);

Page **16** of 17

3.  Default judgment is GRANTED with respect to Plaintiffs Tenecora, Flores, Ascenio, Barrientos, Morocho, Romero, Ramos, Lalvay, Gonzalez and Varela's race-based discrimination claims in violation of Title VII, NYSHRL, and/or Section 1981 (Counts III, IV, and VII);

4.  Plaintiffs are awarded compensatory damages in the total amount of $226,000.00 against Defendants, jointly and severally, apportioned as follows: Plaintiff Tenecora - $40,000.00; Plaintiff Flores - $40,000.00; Plaintiff Ascenio - $12,000.00; Plaintiff Barrientos - $35,000.00; Plaintiff Morocho - $25,000.00; Plaintiff Romero - $30,000.00; Plaintiff Ramos - $8,000.00; Plaintiff Lalvay - $12,000.00; Plaintiff Gonzalez - $20,000.00, and Plaintiff Varela - $4,000.00;

5.  Plaintiffs are awarded punitive damages in the total amount of $130,000.00 against Defendant Ba-Kal Restaurant, apportioned as follows: Plaintiff Tenecora - $25,000.00; Plaintiff Flores - $10,000.00; Plaintiff Ascenio - $10,000.00; Plaintiff Barrientos - $10,000.00; Plaintiff Morocho - $15,000.00; Plaintiff Romero - $20,000.00; Plaintiff Ramos - $10,000.00; Plaintiff Lalvay - $10,000.00; Plaintiff Gonzalez - $10,000.00; and Plaintiff Varela - $10,000.00;

6.  Plaintiffs are awarded attorneys' fees in the amount of $109,088.10 at this time, with leave to supplement as to fees incurred in preparing objections to R&R within fourteen (14) days;

7.  Plaintiffs are awarded costs in the amount of $1,017.38.

The Clerk of Court is directed to enter judgment accordingly and terminate the action.

**SO ORDERED.**

Dated: Central Islip, New York      s/ Denis R. Hurley
       February 8, 2021          Denis R. Hurley
                                   United States District Judge